John E. FASCIANA, Plaintiff,

v.

ELECTRONIC DATA SYSTEMS CORPORATION, a Delaware corporation, Defendant.

C.A. No. 19753–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 31, 2003.
Decided: Feb. 27, 2003.

David S. Eagle, Andrew O. Schiff, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Wilmington, for Plaintiff.

Bruce E. Jameson, Prickett, Jones & Elliott, P.A., Wilmington; Dorothy Culham, Electronic Data Systems Corporation, Plano, TX, for Defendant.

## OPINION

STRINE, Vice Chancellor.

Plaintiff John E. Fasciana seeks an advancement of litigation expenses from defendant Electronic Data Systems Corporation ("EDS") pursuant to § 145 of the Delaware General Corporation Law ("DGCL")[1] and the bylaws of EDS. Fasciana has filed a motion for summary judgment. EDS has responded with its own

---

1. 8 *Del. C.* § 145. This court has jurisdiction over advancement actions pursuant to 8 *Del. C.* § 145(k) and may, pursuant to that subsection, "summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."

cross-motion for summary judgment.[2]

The central issue on the motions is the breadth of the term "agent" in 8 *Del. C.* § 145. In its bylaws, EDS promised to advance litigation expenses to "agents" of the corporation to the extent permitted by § 145. In the actions for which Fasciana seeks advancement, he is alleged to have engaged in wrongdoing in, among other things, his capacity as outside counsel for an EDS division. According to Fasciana, an attorney is always an agent for his client and thus he should be advanced funds for all of the claims against him.

■ In this opinion, I read § 145 as embracing the more restrictive common law definition of agent, which generally applies only when a person (the agent) acts on behalf of another (the principal) in relations with third parties. That is, the policy rationale of § 145's coverage of agents logically extends to only those situations when an outside contractor – such as an attorney – can be said to be acting as an arm of the corporation vis-à-vis the outside world. Although it is true that attorneys are often described as agents of their clients, this loose general usage is not a helpful or sensible ascription to use in implementing § 145. Otherwise, outside attorneys retained by corporations would be able to seek advancement whenever they are accused of malpractice so long as their employing corporations have adopted a maximal bylaw extending coverage to the limits of § 145. Although it would be sen-

sible for corporations to more carefully craft their bylaws, they should be permitted to do so with knowledge that the term agent will be applied in keeping with the intended purpose of the statute. In the case of outside contractors, this purpose is served by a definition of agent that permits contracted parties that act for the corporation in the world to receive advancement when they are sued as a result of their conduct on behalf of the corporation.

In this case, I apply this common law definition of agent to Fasciana's application for advancement. After having done so, I conclude that EDS is, in large measure, entitled to summary judgment in its favor because the claims against Fasciana do not arise from his actions as an agent. As to one relatively discrete charge that arises in both of the actions for which Fasciana seeks advancement, the allegations, when fairly read, do assert that Fasciana acted on EDS's part as an agent with respect to third-parties. I therefore award Fasciana the advancement of his reasonable expenses in defending those allegations and articulate a mechanism to ensure that this advancement can be done non-litigiously and fairly, while preserving the exact amount of his ultimate entitlement for determination in a later indemnification proceeding.

## I.

Much of the factual background underlying this dispute is common to that underly-

---

2. In the alternative, EDS has moved to dismiss or stay this action on two separate grounds. The first is that this advancement action should be put on ice until Fasciana files an ultimate claim for indemnification. The basis for this is said to rest in the doctrine of laches. This argument is without force; any prejudice caused by Fasciana's lack of alacrity in filing was addressed by my refusal to put in place an overly hasty schedule at the instance of a plaintiff who took his time in

filing. The second basis is that the factual circumstances underlying this advancement case are intertwined with the prior pending actions for which advancement of litigation expenses is sought. By this logic, of course, almost every advancement case could be stayed, defeating the purpose of the statutory authorization of advancement. For these and other reasons mentioned at oral argument, these arguments do not support the entry of a stay or dismissal order.

ing another dispute recently resolved by me – *Reddy v. Electronic Data Systems Corp.*[3] Because the parties are familiar with my decision in that case, I will not devote much time to repeating that factual background in this decision.

The origins of this dispute can be traced to the purchase of FACS Incorporated ("FCI") by EDS in May 1995. Among other things, FCI performed asset recovery services for clients involving the identification of client funds that had been erroneously escheated as abandoned property. Fasciana, a New York attorney, represented FCI and its stockholders in selling FCI to EDS. After the acquisition, Fasciana continued to perform legal work for FCI – which was then operated as Global Financial Markets Group ("GFMG"), a division of EDS. In other words, as GFMG's attorney, Fasciana functioned as an attorney for EDS.[4]

Under the terms of a purchase agreement, EDS agreed to purchase FCI for an initial cash payment of $6 million to FCI's stockholders. In addition to this cash payment, EDS placed $3 million into an escrow account that was to be controlled by Fasciana's law firm as escrow agent.[5] Of that $3 million held in escrow, $2 million could be earned by the former FCI stockholders based on FCI's performance dur-

ing the remainder of 1995. The other $1 million could be earned if certain performance targets were achieved and certain outstanding receivables of FCI were collected. Finally, EDS agreed to make up to $14 million in payments under an incentive compensation plan to certain former FCI stockholders provided that GFMG met specified earnings targets during a three-year period beginning in 1996.

## II.

Fasciana seeks advancement for expenses he is incurring in two actions that have been filed against him. The first is a December 4, 2001 indictment by a federal grand jury in the Southern District of New York (the "Criminal Action").[6] Fasciana's co-defendants are Michael Reddy (former Chairman, Chief Executive Officer, and majority stockholder of FCI who continued to have managerial responsibility for that business when it was acquired by EDS) and Joseph Amato (former Chief Financial Officer and stockholder of FCI who continued as FCI's CFO once it was operated as a division of EDS).

The Criminal Action charges Reddy, Fasciana, and Amato with various counts of conspiracy, mail fraud, and wire fraud and alleges that Reddy, Fasciana, and Am-

3. 2002 WL 1358761 (Del.Ch. June 18, 2002).

4. EDS has not argued that Fasciana should be denied advancement because GFMG was separately incorporated as a subsidiary. Rather, it has conceded that Fasciana was an attorney for EDS, but not necessarily EDS's agent simply because of that fact.

5. Fasciana's law firm – not Fasciana personally – was appointed as escrow agent under the terms of the escrow agreement. As escrow agent, the firm was to hold the funds in the escrow account until the contractual prerequisites to payment had been satisfied. For its services, Fasciana & Associates, P.C. was to receive $3,000 annually payable by the

former FCI stockholders. Under the escrow agreement, Fasciana and Associates was indemnified for any losses, liabilities, or expenses incurred without gross negligence or willful misconduct arising out of or in connection with the escrow agreement. The indemnification obligation was to be split equally between EDS and the former FCI stockholders. The escrow agreement does not provide for advancement of litigation expenses. Notably, that agreement also contains an integration clause stating that it constituted the entire agreement of the parties.

6. *United States v. Reddy*, No. S3–01–58(LTS) (S.D.N.Y. filed Dec. 4, 2001) (Indictment).

ato "participated in a scheme to defraud EDS by inducing EDS to make various contingent payments to the FCI shareholders and [various key employees of FCI], when, in truth and in fact, such payments were not due and owing."[7] These contingent payments were made from the escrow account or in connection with the incentive compensation plan. Specifically, the indictment alleges that:

1. Reddy and others improperly caused GFMG to record as 1995 income certain monies obtained from fees from pre-escheatment work performed for two large clients. Reddy and Fasciana supposedly recorded this income despite knowing that GFMG had no basis to conclude that the client funds out of which GFMG was to be paid a percentage as its fee were not subject to escheatment. The motive behind these actions was to help GFMG meet a contractual performance target, thus increasing payments to Reddy and other former FCI stockholders from the escrowed funds that Fasciana controlled. EDS authorized Fasciana to pay these former stockholders $2 million out of the escrow account, and Fasciana received more than $66,000 for his trouble.[8]

2. In 1997, Reddy and others falsely recorded income based on claims that GFMG had supposedly made to state escheators for return of erroneously escheated client funds, although such claims had not in fact been filed. Reddy and Fasciana took actions in 1998 to conceal this improper reporting. The motive be-

hind their actions was to obtain for the former FCI stockholders additional monies under the incentive compensation plan. In connection with this part of the scheme, Fasciana received approximately $195,000.[9]

3. Reddy, Fasciana, and Amato caused payments for work done by GFMG *after* EDS purchased FCI to be recorded as if it was performed by FCI *before* the purchase. The purpose of these actions was to make it appear that the former FCI stockholders were entitled to escrowed funds for the collection of *pre*-acquisition receivables. Fasciana received more than $17,000 from these escrow payments.[10]

4. To conceal an improper $1.6 million accrual of 1995 income, in or about 1996, Reddy, with the assistance of Fasciana, attempted to convince GFMG's clients Kidder and GECC to approve the approximately $7 million in potential pre-escheatment claims identified by Reddy, even though, as Reddy and Fasciana knew, the claims were invalid.[11]

5. To persuade Kidder and GECC to accept the invalid pre-escheatment claims, Reddy, with the assistance of Fasciana, made repeated false statements and omitted material information in communications with GECC, KIDDER, and internal and external counsel for GECC and Kidder.[12]

On September 17, 2002, Judge Laura Taylor Swain of the United States District Court for the Southern District of New York declared a mistrial in the Criminal

---

7. Indictment ¶ 12.

8. *See* Indictment ¶¶ 13–23.

9. *See id.* ¶¶ 24–28.

10. *See id.* ¶¶ 29–30.

11. Indictment ¶ 20.

12. *Id.* ¶ 34(a).

Action after the jury was unable to reach a verdict.[13] Judge Swain has rescheduled trial in the Criminal Action for April 28, 2003.[14]

In addition to the Criminal Action, Fasciana has been named by EDS as the defendant in a civil action pending in the United States District Court for the Eastern District of Texas (the "Civil Action").[15] The causes of action recited in the Civil Action are: (1) attorney malpractice and negligence; (2) gross negligence; (3) breach of fiduciary duty; (4) fraud; and (5) breach of contract. The Civil Action is based on the same factual scenario that underlies the Criminal Action. In its second amended complaint, EDS alleges that Fasciana was an attorney for EDS and that Fasciana regularly provided EDS with legal advice. EDS goes on to allege that Fasciana engaged in wrongful conduct, failed to disclose material information to EDS, and made material misrepresentations to EDS. Specifically, in paragraphs 23 to 25 of its complaint, EDS also alleges that:

23. ... GECC and its counsel met or spoke with Reddy and/or Fasciana on numerous occasions between December 1995 and July of 1996, during which time Reddy and Fasciana tried to persuade GECC that their analysis was correct, and obtain GECC's agreement with the determination that the claims were valid and should therefore not be escheated.

24. In or about spring of 1996, GECC's in-house counsel requested another lawyer be brought in to evaluate the [pre-escheatment] claims and

the methology used [to determine whether the subject funds should be escheated]. Reddy selected Peter Gruenberger, of Weil, Gotschal [sic], to review them on behalf of both parties. However, Gruenberger told Reddy at that time, and later told EDS, that it would be inappropriate for him to express an opinion on the validity of the claims since he did not have the necessary industry background to be able to opine about the appropriateness of the applied methodologies. Notwithstanding Gruenberger's disavowal, on or about June 7, 1996 Fasciana prepared a draft legal memorandum falsely purporting to express Gruenberger's opinions regarding these claims. ...

25. GECC finally agreed not to escheat [the] funds based on Reddy's representations that EDS expert personnel had reviewed the claims and concluded they were valid and GECC should not escheat the funds. These representations were made on several occasions between February 1996 and in or about July 1996 by Reddy and/or Fasciana to GECC and its counsel. ...[16]

### III.

 Before me are cross-motions for summary judgment. Even when presented with cross-motions for summary judgment, the court is not relieved of its obligation to deny summary judgment if a material factual dispute exists. In evaluating cross-motions for summary judgment,

---

13. *See* Letter from David S. Eagle to Vice Chancellor Leo E. Strine, Jr. of Dec. 20, 2002 at 1.

14. *See id.*

15. *Elec. Data Sys. Corp. v. Fasciana*, C.A. No. 4:01cv93 (E.D.Tex. Jan. 17, 2002) (2d Am. Compl.).

16. EDS's 2d Am. Compl. ¶¶ 23–25.

the court must examine each motion separately[17] and only grant a motion for summary judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law.[18]

In this case, EDS argues that it has been put in an impossible position to demonstrate facts in its favor. Because Fasciana is under criminal indictment, he has resisted discovery on the basis that it might tend to incriminate him.[19] As a remedy for Fasciana's refusal to produce the evidence EDS has requested, EDS asks me to draw factual inferences against him and in EDS's favor.

In this "summar[y]" advancement case,[20] I believe that EDS's diminished access to information is not material. The unfortunate reality is that Fasciana faces criminal charges and any prudent defense attorney would counsel him not to waive his constitutional privilege. His situation is one that could foreseeably arise in other advancement proceedings. The inaccessibility of his testimony is, however, not critical. What is critical is the nature of the claims against Fasciana, claims that in this case were stated by the federal government in its indictment in the Criminal Action and by EDS itself in the Civil Action complaint.

Inherent in the very nature of a summary advancement action is the necessity for the court to act in the face of some factual uncertainty. The key question is whether the plaintiff seeking advancement is facing claims that are subject to his advancement right, a determination that can, in this case and in most cases, be made based on a review of the pleadings against him in the actions for which advancement is sought. That is true here, and I will determine Fasciana's right to advancement by reference to the undisputed terms of the indictment in the Criminal Action and the complaint in the Civil Action, as well as by reference to certain other undisputed exhibits.

With this procedural context in mind, I turn to the parties' contending arguments.

## IV.

Fasciana's argument for advancement is grounded in an EDS bylaw that states as follows:

> *Each person who at any time shall serve or shall have served as a Director,* officer, employee, or *agent of the Corporation . . . shall be entitled to* (a) indemnification and (b) *the advancement of expenses* incurred by such person *from the Corporation as, and to the fullest extent, permitted by Section 145 of the DGCL* or any successor statutory provision, as from time to time amended.[21]

Under this bylaw, Fasciana argues,[22] and I agree, that EDS has bound itself to provide him with advancement for claims against him *in the capacity of an agent* for

---

17. *See Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del.1988).

18. *See Scureman v. Judge*, 626 A.2d 5, 10 (Del.Ch.1992), *aff'd sub nom.*, *Wilmington Trust Co. v. Judge*, 628 A.2d 85 (Del.1993).

19. *See* U.S. Const. amend. V ("nor shall [any person] be compelled in any criminal case to be a witness against himself").

20. 8 *Del. C.* § 145(k).

21. EDS Bylaws, art. 6.1 (emphasis added).

22. *See* Fasciana's Opening Br. at 1–2 (conceding that advancement would only be proper if Fasciana was acting as an agent of EDS).

EDS if § 145 of the DGCL would allow.[23] This step in Fasciana's argument is not disputed by EDS.

The most important portion of Fasciana's argument – that he has been sued as an agent of EDS – is what is disputed. Fasciana primarily argues that because he is alleged to have committed misconduct in his capacity as an attorney for EDS, he must necessarily face liability as an agent of EDS because an attorney *is always* an agent for his client. Secondarily, Fasciana argues that he is entitled to advancement even if a narrower definition of agency applies that requires him to have acted on behalf of EDS as to third parties because he is alleged to have made misrepresentations on EDS's behalf to key personnel at GECC and Kidder.

EDS counters that Fasciana – whether as attorney or escrow agent – was not an "agent" of EDS as that word is used in § 145 and in EDS's bylaws.[24] Specifically, EDS argues that § 145 embraces the core common law definition of an agent, which requires that the agent be authorized to act on behalf of the principal as to third parties.[25] EDS contends that Fasciana was not its agent under this definition.

## V.

## A.

The key question that must be addressed to resolve these cross-motions is what definition of agent did the General Assembly intend to use in drafting § 145? In framing the question this way, I obviously infer that EDS's bylaws were intended to track the meaning of agent in § 145.

The term agent is thrown around in many legal contexts and often without great precision. That lack of precision is what largely gives whatever force exists behind Fasciana's argument.

It is undoubtedly true that attorneys are identified as common examples of agents.[26] This is logical because there are many circumstances in which lawyers act as agents, by speaking for their clients and binding them to commitments. This · is also understandable, if less reasoned, because lawyers are understood to be fiduciaries of their clients [27] and the concepts of fiduciary and agency status are related and sometimes confused. For these reasons, Fasciana is able to point to numerous authorities that describe the attorney-client relationship as one of principal and

---

**23.** *See Reddy,* 2002 WL 1358761, at *3 (interpreting identical bylaw similarly in circumstances involving an officer).

**24.** Section 145 permits corporations to afford advancement and indemnification rights to their agents. *See* 8 *Del. C.* § 145(e) ("Such expenses (including attorneys' fees) incurred by . . . agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate."). *See generally* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 4.25 (2003) (discussing the advancement of litigation expenses to corporate agents); Rodman Ward, Jr. et al., *Folk on the Delaware General Corporation Law* § 145.1 (2003) (discussing generally § 145's authori-

zation of advancement and indemnification with respect to corporate agents).

**25.** *See* EDS's Answering Br. at 8–10.

**26.** *See Restatement (Third) of the Law Governing Lawyers* ch. 2 Introductory Note (2000) ("A lawyer is an agent, to whom clients entrust matters, property, and information, which may be of great importance and sensitivity, and whose work is usually not subject to detailed client supervision because of its complexity.").

**27.** *See In re Kennedy,* 442 A.2d 79, 89 (Del. 1982) ("It is well settled in Delaware that an attorney is bound by a fiduciary duty in his dealings with his client.").

agent.[28]

He therefore argues that the General Assembly must have known that lawyers are often described as agents of their clients and that § 145 should be read as including outside attorneys for corporations as agents for all purposes, regardless of the nature of the legal work they performed as counsel for the corporations they represent. In support of this argument, he claims that a contrary reading of the term agent would involve an impermissible deviation from plain language in order to effect a public policy end not spelled out in the statute.

Although this court should be chary about limiting the practical effect of clear statutory language, Fasciana has not persuaded me that the General Assembly's use of the term agent in § 145 was intended to be co-extensive with the broadest possible meaning of that term in colloquial American legal usage. Rather, it seems more likely that the General Assembly intended the term to be used in the more precise sense characteristic of its primary common law definition,[29] which embraces the "essential" requirement that an agent have "the power to act on behalf of the principal with third persons."[30] That is,

**28.** *See* Fasciana's Opening Br. at 8–9 (citing authorities).

**29.** *See The American Heritage Dictionary of the English Language* 32 (4th ed.2000) ("[o]ne empowered to act for or represent another"); *Ballentine's Law Dictionary* 50 (3d ed. 1969) ("One of the parties to an agency relationship, the one who acts for and represents the other party who is known as the principal, being a substitute or deputy appointed by the principal with power to do certain things which the principal may or can do."); *Black's Law Dictionary* 64 (7th ed.1999) ("[o]ne who is authorized to act for or in place of another; a representative"); *Webster's Ninth New Collegiate Dictionary* 64 (1987) ("one who acts for or in the place of another by authority from him").

**30.** *Borders v. Townsend Assocs.*, 2002 WL 725266, at *5 (Del.Super.Apr.17, 2002) (quoting *Wilson v. Pepper*, 1995 WL 562235, at *3 (Del.Super.Aug.21, 1995), *aff'd*, 676 A.2d 909 (Del.1996)); *see Fisher v. Townsends, Inc.*, 695 A.2d 53, 57–58 (Del.1997) ("An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." (citations and internal quotation marks omitted)); *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 32012, at *4 (Del.Super. Mar.30, 1988) (stating that essential elements of an agency relationship include: (1) the agent having the power to act on behalf of the principal with respect to third parties; (2) the agent doing something at the behest of the principal and for his benefit; and (3) the principal having the right to con-

trol the conduct of the agent); *Equitable Life & Cas. Ins. Co. v. Rutledge*, 9 Ariz.App. 551, 454 P.2d 869, 873 (1969) ("An essential element of the principal-agent relationship which carries a fiduciary responsibility is the ability of the agent to act on behalf of his principal with third parties."); *Wallace v. Sinclair*, 114 Cal.App.2d 220, 250 P.2d 154, 160 (1952) ("The heart of agency is expressed in the ancient maxim: *Qui facit per alium facit per se* [one acting by another is acting for himself]." (citation and internal quotation marks omitted)); 2A C.J.S. *Agency* § 2 (1972) ("The law of agency is based on the Latin maxim 'Qui facit per alium, facit per se,' variously rendered as 'He who does an act through another is deemed in law to do it himself,' or 'One acting by another is acting for himself.' This maxim is fundamental to agency, and is considered to apply and enunciate the general doctrine on which the law relative to the rights and liabilities of principal and agent depends." (footnotes omitted)); 2A C.J.S. *Agency* § 5 ("Agency is a relation which is variously described as being representative, fiduciary, voluntary, and consensual, and usually contractual. It is a legal relation, characterized by the power of the agent **to act on behalf of the principal with third parties**." (bold emphasis omitted)); *see also Channel Lumber Co. v. Porter Simon*, 78 Cal. App.4th 1222, 93 Cal.Rptr.2d 482, 486 (2000) ("The essence of an agency relationship is the delegation of authority from the principal to the agent which permits the agent to act not only *for*, but *in the place of*, his principal in dealings with third parties." (citation and internal quotation marks omitted)); *Restate-*

the General Assembly would reasonably assume that the courts of this state would use that definition of agent that best advanced the purposes of § 145.[31]

■ The public policy served by authorizing the advancement and indemnification of litigation expenses incurred by officers and directors is well-settled. Without affording this protection, corporations would find it difficult to retain high-quality directors and officers, especially ones willing to make socially useful decisions that involve economic risk. By authorizing the provision of indemnity and advancement within certain statutory guidelines, the General Assembly sought to encourage well-qualified persons to serve as directors and officers of Delaware corporations and, in that capacity, to be willing to commit their corporations, after the exercise of good faith and care, to risky transactions that promise a lucrative economic return.[32]

■ The public policy served by permitting corporations to provide advancement and indemnification rights to agents is a bit less clear. On the one hand, it seems apparent that corporations are probably presented with no shortage of outside contractors seeking to perform contractual services for them. On the other hand, it is also probably the case that contractual providers are interested in ensuring that they do not unfairly bear the risk of litigation for acting on behalf of their employing corporation. Arguably, a broad reading of the term agent, therefore, would encourage a steady flow of potential agents, because the risk of working as an outside contractor (in this case, as a lawyer) would be greatly diminished.

Although the parties have cited no statutory text or legislative history that bears precisely on this policy balance,[33] it strikes me as more likely that the General Assembly conceived of the inclusion of agents within § 145 as having a fairly limited purpose. In my view, what is most probable is that the General Assembly believed that corporations ought to be able to extend advancement and indemnification rights to outside contractors who acted on behalf of the corporation in dealings with third parties.[34] That is, the General As-

---

*ment (Second) of Agency* § 1(1) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act *on his behalf* and subject to his control, and consent by the other so to act." (emphasis added)).

**31.** *Restatement (Second) of Agency* § 1 cmt. f *(1958)* ("Whether the word 'agent' as used in a statute corresponds to the meaning here given depends, with other factors, upon the purpose of the statute.").

**32.** *See Mayer v. Executive Telecard, Ltd.,* 705 A.2d 220, 223 (Del.Ch.1997) ("[The] purpose [of § 145] is to encourage capable persons to serve as officers, directors, employee or agents of Delaware corporations, by assuring that their reasonable legal expenses will be paid."); *see also Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343–44 (Del.1983) (stating that the policy of Delaware's indemnification statute is to encourage corporate officials to resist unjustified lawsuits and to encourage

capable individuals to serve as corporate officials); *Scharf v. Edgcomb Corp.,* 1997 WL 762656, at *4 (Del.Ch. Dec.4, 1997) ("Indemnification provisions authorized by statute and incorporated into bylaws by shareholder action demonstrate the desire to broaden the flexibility of decision making by eliminating the chilling effect of potential personal liability on the part of officers and directors. Shareholder democracies want directors and officers to engage in broadly based decision making in order to enhance shareholder value by encouraging prudent risk taking to their and the other corporate constituencies' advantage.").

**33.** My own independent consultation of the key treatises on the DGCL has also yielded nothing that usefully bears on the resolution of the issue.

**34.** *See Cochran v. Stifel Fin. Corp.,* 2000 WL 286722, at *16 (Del.Ch. Mar.8, 2000) [*Cochran I*] ("[T]he hardly uncommon term 'agent'

sembly intended that the term agent be used in its most traditional sense as involving action by a person (an agent) acting on behalf of another (the principal) as to third parties.[35]

In this traditional context, the acts of the agent within the scope of the agency are fairly said to be the actions of the principal. As a result, it makes logical sense that if the agent is sued for those actions, she might look to her principal for indemnity. It also makes sense for § 145 to track this concept.

■ By contrast, whether or not attorneys are sometimes loosely referred to agents of their clients, there seems to be little to commend extending that loose appellation into the § 145 context. One can imagine many situations in which outside attorneys are engaged by corporations to provide specialized legal advice about a particular problem. That type of representation might simply involve the lawyer providing candid, confidential legal advice to the client to address a legal issue arising out of specific factual circumstances. In providing that advice, the lawyer is duty-bound to give his client her best legal judgment, applying appropriate standards of professional care. Indeed, in that capacity, the lawyer might well owe the obligations of a fiduciary to the client for obvious reasons, including that the attorney has been entrusted with the client's confidences in circumstances in which the client is entitled to repose confidence and trust.[36] That this is so does not, it seems to me, make the lawyer the agent of the corporation in the sense that § 145 intends. If all that the attorney does is give the corporation confidential, private legal advice *that is not intended for use with third-parties,*[37] the policy concerns of § 145 are not implicated and the dangers of applying an overly loose definition of agency quickly emerge.[38]

must be given its usual meaning."); *cf.* Micah John Schreurs, Comment, *VonFeldt v. Stifel Financial Corp.: Clarifying the Scope of Delaware Corporate Indemnification Law,* 25 J. CORP. L. 161, 173–75 (1999) (while noting the general permissiveness of § 145, stating that "[c]ommon law agency principles ... should be used in interpreting section 145.").

35. *See* 1 *Del. C.* § 303 ("Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."); *Stiftel v. Malarkey,* 384 A.2d 9, 22 (Del.1977) ("Where a statute uses words which have a commonly accepted meaning at common law, absent a showing to the contrary, it is presumed the word is used in the sense which it is understood at common law." (citations omitted)). At common law, the core aspect of the term "agent" contemplated a representative relationship involving an agent acting on behalf of a principal with respect to third parties. *See supra* note 30.

36. For example, a lawyer might be given access to confidential business information in order to provide legal advice. If the lawyer gave that information to a competitor, there is little doubt that the lawyer would be deemed to have committed a breach of fiduciary duty.

37. If an attorney gives legal advice that is shared by the corporation with third parties, the attorney would have a strong claim to agent status if that sharing results in a lawsuit against the attorney.

38. Fasciana relies in part on a passage from a respected treatise on Delaware corporate law. *See* David A. Drexler et al., *Delaware Corporation Law and Practice* § 16.02(1) (2000) ("Although the issue most often arises in connection with directors and officers, [§ 145] is broad enough to cover outsiders such as consultants, attorneys, and other independent contractors whose association with the corporation falls within the rubric of 'agent.'"). This passage does not, however, contradict the holding in this opinion. I agree that an outside attorney *can* be covered by § 145, *but only if he actually falls within the rubric of "agent."* But, in the context of the present case, Fasciana was not, for the most part, an agent of EDS. *See supra* note 30 and accom-

Why? Because in a malpractice dispute between the corporation and the lawyer, the lawyer would, if deemed an agent and if the corporation had a not-uncommon bylaw providing mandatory advancement rights to agents, find himself able to fund his defense from the corporation's coffers. This is an odd result that is unlikely to have resulted from a specific retention agreement between a corporation and outside attorney,[39] and is not one that § 145 should be construed as creating when the use of a more constrained and, indeed, traditional definition of agency can avoid that result. Put another way, corporations crafting general advancement bylaws should be able to do so based on a relatively stable and confined definition of agent without the need to include numerous caveats. They then remain free to craft more specific contracts with certain outside providers who do not fall within the statutory definition of agent when that is in their best interests as a business.[40]

In concluding that this approach best implements the General Assembly's intent in including agents within § 145's reach, I reach a result that is like that reached by some other state courts in interpreting the term agent in their own corporation codes. For example, in *Western Fiberglass, Inc. v. Kirton, McConkie & Bushnell,*[41] the Utah Court of Appeals held that a law firm was not a corporate "agent" as the word "agent" is used in indemnification provision of the Utah Business Corporation Act.[42] It did so on the basis that indemnification statutes are "designed to protect persons exercising corporate discretion and authority, not the attorneys those persons hire to give them legal advice."[43]

## B.

■■■■ Based on this reasoning, the question then becomes whether Fasciana faces claims that involve his conduct as an agent for EDS in dealing with third parties. In large measure, the answer is no. By and large, Fasciana is alleged to have

panying text. With respect to Fasciana's reference to the Restatement of the Law Governing Lawyers, *see Restatement (Third) of the Law Governing Lawyers* ch. 2 Introductory Note (2000) ("A lawyer is an agent, to whom clients entrust matters, property, and information, which may be of great importance and sensitivity, and whose work is usually not subject to detailed client supervision because of its complexity."), this passing reference to the law of agency is an example of the loose usage of the term agent and the need to apply the concept with precision in particular circumstances. *See supra* p. 171. As the reader might expect, the Restatement does not address the peculiar policy considerations that underlie § 145. *See supra* pp. 170–71.

39. Put another way, if corporations wish to hire outside attorneys on the contractual promise that the outside attorneys will have their litigation costs fronted by the corporation in a malpractice dispute, they can forge that result by a specific contract. For rather obvious market reasons, I find it unlikely that this sort of retention agreement will emerge

as common if the reasoning of this decision stands the test of time.

40. In reaching this result, I am also aware that other highly skilled outside contractors may — like attorneys — assume fiduciary duties because they are entrusted with confidential access to the corporation's information or funds. It would therefore be difficult credibly to cabin the rule Fasciana wishes to apply only to attorneys.

41. 789 P.2d 34 (Utah Ct.App.1990).

42. *See id.* at 38.

43. *Id.* (footnote omitted); *see also Channel Lumber Co.,* 93 Cal.Rptr.2d at 490 ("Nor is there any other benefit to the shareholders that can be derived by compelling the corporation to indemnify outside trial counsel whom the corporation ends up suing for malpractice. Indeed, applying [the California statutory indemnification provision] to such an attorney flies in the face of the statute's purpose to protect shareholders from unreasonable demands for indemnification.").

engaged in misconduct in his capacity as a legal advisor to EDS, by assisting Reddy in various acts of improper internal accounting designed to inflate improperly the payments EDS made to the former FCI stockholders under the escrow agreement and to the former FCI managers under the incentive compensation plan. Likewise, Fasciana is alleged to have violated his law firm's duties as escrow agent by releasing funds that he knew were not properly payable to the former FCI stockholders and by accepting a portion of the funds for himself.[44]

■ There is one exception, however, to my conclusion that Fasciana does not confront claims arising out of his conduct as an agent of EDS. Specifically, I am referring to the allegations by the federal government and EDS that Fasciana, on behalf of EDS, made certain misrepresentations to Kidder and GECC.[45] According to those allegations, Fasciana and Reddy made factual misrepresentations to Kidder and GECC so that Kidder and GECC would approve certain pre-escheatment claims that Fasciana and Reddy knew to be invalid.

■ As to these allegations, Fasciana is clearly being held to account for representations he made to third parties – Kidder and GECC – as an agent of EDS. According to EDS's own allegations, Fasciana was present at important meetings with these third parties and gave them assurances on behalf of his client EDS. Because of these representations Fasciana made as an agent of EDS, these third parties agreed not to escheat the identified funds, and, as a result, the earnings of the GFMG division of EDS were improperly inflated, benefiting its managers and the former FCI stockholders. This conduct, if actually proven to have been wrongful, exposed EDS to liability to GECC and Kidder.[46] This alleged conduct now pro-

---

**44.** I should also note that I find unconvincing Fasciana's contention that he is entitled to advancement by virtue of the fact that his law firm served as an escrow agent for EDS and the former shareholders of FCI. Notwithstanding the use of the term "escrow *agent*" it is clearly established that "[a]n escrow holder is not as such an agent of either party to the transaction until the event occurs which terminates the escrow relation." *Restatement (Second) of Agency* § 14 D (1958). That is, in essence, an escrow agent is agent to the terms of the escrow contract. As noted earlier, *see supra* note 5, the escrow agreement at issue in this case has an *indemnification* provision that notably does not provide for the *advancement* of reasonable litigation expenses. *See* Escrow Agreement ¶ 8. And the escrow agreement contained an integration clause that provided that "[t]his Agreement and the Purchase Agreement contain the entire agreement and understanding of the parties with respect to the transactions contemplated hereby." *Id.* ¶ 16. It is, of course, a maxim of contract interpretation that more specific contractual terms will trump those that are more general. *See Davis v. Dawson, Inc.,* 15 F.Supp.2d 64, 109 (D.Mass.1998); *Amin v. Lammers,* 1995 WL 231048, at *4 (E.D.Pa. Apr.18, 1995). That sound principle requires that the terms of escrow agreement (which allow for indemnification but not advancement and provide that its terms are "the entire agreement and understanding of the parties") trump the advancement provision of EDS's bylaws (which was not drafted to specifically control the escrow relationship at issue in this case). More fundamentally, the escrow agreement highlights an important point: courts should be reluctant to interpret § 145 and bylaws that implement it as displacing the more specific contractual arrangements that are typically drafted between corporations and outside contractors, such as attorneys, investment bankers, engineers, and information technology providers.

**45.** *See* Indictment ¶¶ 20, 34(a) & 35(e); EDS's 2d Am. Compl. ¶¶ 23, 24 & 25.

**46.** Specifically, the Civil Action alleges that:

GECC and its counsel *met or spoke with Reddy and/or Fasciana* on numerous occasions between December 1995 and July of 1996, during which time *Reddy and Fascia-*

vides the basis for potential legal liability for Fasciana in the form of a federal criminal indictment and a civil lawsuit seeking hefty damages. Under EDS's own preferred definition of agent, which I have largely adopted, it owes Fasciana advancement as to his costs in defending these allegations.

## C.

According to Fasciana, the implication of a finding that any portion of the claims against him in the indictment and in the Civil Action are subject to advancement is that all of his defense costs for the entirety

> na tried to persuade GECC that the [pre-escheatment] analysis was correct, and obtain GECC's agreement with the determination that the claims were valid and should therefore not be escheated.

EDS's 2d Am. Compl. ¶ 23 (emphasis added). And that:

> [Certain false] representations *were made on several occasions between February 1996 and in or about July 1996 by Reddy and/or Fasciana to GECC and its counsel.* These representations were false when made, and known by Reddy and Fasciana to be false when made, inasmuch as EDS' expert personnel had reviewed the claims but had *not* concluded the claims were valid and told Reddy so. Nonetheless, in reliance on these *representations of Reddy and/or Fasciana,* GECC agreed during the summer of 1996 not to escheat the funds.

*Id.* ¶ 25 (emphasis added, except for the word "not," which was emphasized in the original).

Although EDS does not explicitly allege that these communications were specifically authorized by EDS, I find that Fasciana was acting on behalf of EDS when he engaged in discussions with GECC. When an attorney is communicating with third parties in the presence of, or otherwise with the approval of, a high-level company official, like Reddy, and the official not only acquiesces in that conduct but joins in it, it can fairly be said that the communications were on behalf of the company and made as part of the agent's duty to pursue the principal's objectives, using his professional skill. Although a creative reading of these allegations — focusing on the construction "and/or" — might suggest that

of those actions must be advanced. Any apportionment of costs should wait entirely until a later indemnification proceeding. In support of this argument, Fasciana cites *Citadel Holding Corp. v. Roven,*[47] as binding precedent.

In contrast, EDS argues that it is Fasciana's burden to prove entitlement to advancement and that he should only receive advancement for those portions of his defense expenditures that might ultimately be indemnifiable. It says that *Roven* does not mandate all-or-nothing advancement decisions and, more importantly, nor does § 145 or EDS's bylaws.[48]

> Fasciana did not necessarily engage in the conduct of which EDS complains or only played the role of assistant to Reddy, it still is the case that Fasciana will need to respond to these allegations in court. EDS may not allege Fasciana made false representations to GECC on behalf of EDS — *i.e.,* that Fasciana acted as EDS's agent — in the Civil Action and then walk away from those allegations when Fasciana seeks advancement in a § 145 action. Likewise, by its own allegations, EDS has convinced me that the similar allegations in the Criminal Action involve conduct that Fasciana committed as an agent of EDS.

**47.** 603 A.2d 818 (Del.1992).

**48.** To support its position, EDS points to *Cochran v. Stifel Fin. Corp.,* 2000 WL 1847676 (Del.Ch. Dec.13, 2000) [*Cochran II*], *aff'd in part, rev'd in part,* 809 A.2d 555 (Del.2002), where the court, according to EDS, "indicated agreement" with the view that an indemnification could be granted with respect to certain claims (but not others) within a single proceeding.

In *Cochran II,* the case on which EDS relies, the court resolved cross-motions for summary judgment with respect to Cochran's § 145 indemnification claim against his former corporation. (Robert M. Cochran was a former director, officer, and employee of his corporation, *see Cochran II,* 2000 WL 1847676, at *1.) In resolving those cross-motions, the court granted the corporation's summary judgment motion with respect to three claims in one proceeding and granted

In addressing this issue, I begin with a rejection of the notion that the *Roven* case decided the question before me. That case, which involved complex facts, does not hold that a plaintiff seeking advancement is entitled to have *all* of his expenses advanced if he merely proves that some portion of the case against him is subject to a contractual right of advancement.[49] Had the Supreme Court wished to speak on that question, it would have done so clearly. I therefore turn to what I regard as an open question of law.

█ Candidly, the only real attraction of Fasciana's position is that it is simpler for the court. By deferring apportionment of expenses until a later indemnification proceeding, Fasciana's rule keeps advancement proceedings tidier. But the cost of that tidiness seems to me to be outweighed by the unreasonableness of requiring a corporation like EDS to bear a credit risk it did not contract to assume.

What EDS contracted for was to bear the risk of later non-payment on expenses for which advancement is owed in the event that the underlying conduct of Fasciana and/or the outcome of the matter ultimately disentitles Fasciana to indemnification.[50] I do not believe that EDS contracted to provide Fasciana with a loan so that he could fund defense costs that do not arise out of his conduct as an agent and therefore could never be subject to advancement.[51]

---

Cochran's with respect to the fourth. *See id.* at *4 & *11. Although it is true that the court did not directly address the splitting of claims for § 145 purposes because the parties in effect agreed to the splitting (this was accomplished by way of the corporation only seeking summary judgment as to three of the four claims, and Cochran only seeking summary judgment with respect to the fourth, *see id.* at *4), the court did note that such a segregation of claims for indemnification purposes can be "sensibly" done. *See id.* at *4 n. 10. *Cochran II's* suggestion followed the approach of an earlier case. *See Merritt–Chapman & Scott Corp. v. Wolfson,* 321 A.2d 138, 141 (Del.Super.1974).

49. The *Roven* case involved a very broad advancement and indemnification contract between a director and a corporation. The Supreme Court held that the indemnitee was entitled to advancement for affirmative defenses he asserted in response to claims against him in his official capacity because such defenses were obviously a method of defending against those official capacity claims. 603 A.2d at 824. Moreover, the Court also held that the indemnitee was entitled to advancement to cover his costs in asserting certain counterclaims, because those counterclaims had to be asserted by the indemnitee or lost as a result of the official capacity claims against him, and that his counterclaims were therefore "advanced to defeat, or offset" the official capacity claims.

*Id.* at 824 (also indicating that this was a "difficult" issue).

Although I concede that *Roven* can be stretched to have relevance to the question before me, I do not believe that the case can be reasonably read as clearly answering it. Indeed, *Roven's* focus on the fact that the indemnitee's affirmative defenses and counterclaims were part and parcel of reasonable efforts to defeat the official capacity claims supports the inference that courts should order the advancement of only those reasonable costs related to the litigation of claims arising out of the indemnitee's actions in the capacity that triggers the indemnitee's right to advancement. In this case, Fasciana is only entitled by contract to advancement for costs to defend himself against allegations that he engaged in improper conduct as an EDS agent and I do not believe that *Roven* requires that this court grant him advancement for costs that fall outside that entitlement.

50. A § 145 advancement is best thought of as credit advanced to a director, officer, employee, or agent of a corporation. *See Advanced Mining Sys., Inc. v. Fricke,* 623 A.2d 82, 84 (Del.Ch.1992).

51. The United States District Court for the Western District of New York in *Booth Oil Site Administrative Group v. Safety–Kleen Corp.,* applying a somewhat similar New York statutory scheme, limited an advancement

The difficult problem is apportionment. As Fasciana notes, the allegations involving his conduct in making representations to GECC and Kidder on behalf of EDS are part and parcel of larger conspiracy counts in the Criminal Action indictment. Similarly, the identical allegations in the Civil Action constitute only a portion of the reason he is alleged to have committed actionable misconduct against EDS. How then, Fasciana asks, can he apportion the litigation costs that address just that conduct? Although there is some facial plausibility to Fasciana's argument, it has no deeper force.

The reality is that his lawyers will know the time that they spend in developing facts to show that Fasciana made no culpable representations to GECC or Kidder on EDS's behalf. They will know the amount of time they spend arguing that whatever Fasciana said or did not say to GECC or Kidder on EDS's behalf did not, as a matter of law, constitute a crime or civil wrongdoing. That is, this alleged miscon-

duct that Fasciana undertook as an agent is sufficiently discrete that experienced counsel will know when they are addressing it rather than the separate misconduct Fasciana allegedly committed when not acting as EDS's agent.

## VI.

EDS attempts to put the brakes on any advancement award by arguing that Fasciana has not established the reasonableness of the attorneys' fees he has already incurred. According to EDS, the records submitted by Fasciana are "incomplete," [52] "inflated," [53] "cryptic," [54] "completely illegible" [55] or "insufficient to establish the reasonableness of the amounts sought." [56] And, EDS claims that certain billed time relates to matters other than Fasciana's defense and is not related to Fasciana's relationship with EDS.

Although I agree with EDS that some of the expense documentation submitted by

award to those litigation expenses related to that portion of the alleged wrongdoing committed while the alleged wrongdoer was a corporate officer. 137 F.Supp.2d 228 (W.D.N.Y.2000). *Booth* involved a hazardous waste site in the City of North Tonawanda, New York. *See id.* at 230–31. In 1948, a father and son began operating a waste oil recycling and reclaiming facility at this North Tonawanda site. *See id.* at 231. In 1960, the waste oil company incorporated. *See id.* From 1960 to 1983, the son served as an officer and director of the corporation, Booth Oil Company, Inc. *See id.* In 1998, the Booth Oil Administrative Group sued the son, among others, seeking a recovery of costs related to the clean-up of the hazardous waste site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). *See id.* at 230. The son then sought an advancement of litigation expenses from the Booth Oil Company to cover his attorneys' fees and expenses related to the CERCLA litigation. *See id.* at 231. Because the litigation involved the son's activities going all the way back to 1948 — *i.e.*, before the company was incorporated – the court limited

the advancement to that portion of the litigation expenses that was related to the son's activities as a corporate officer. *See id.* at 238. In order to accomplish this, the *Booth* court divided the number of years the son was a corporate officer (*i.e.*, 23) by the total number of years he was involved with the company, whether pre- or post-incorporation (*i.e.*, 35). *See id.* Accordingly, the son was entitled to an advance award of 65.71% of his total anticipated litigation expenses. *See id.*; *cf. Reddy*, 2002 WL 1358761, at *5 ("If his conduct is not the proper subject of indemnification by EDS, Reddy must repay the funds advanced to him by the corporation.").

52. Def.'s Answering Br. at 32.

53. *Id.*

54. *Id.* at 33.

55. *Id.* at 34.

56. *Id.* at 33.

Fasciana is unclear or not particularly helpful to understanding how or why certain logged attorney time was spent, it is also true that Fasciana could not have anticipated exactly how this motion would be decided. Rather than issue a premature ruling, therefore, I will not decide the amount of Fasciana's entitlement to date, but instead articulate how the parties are to solve this problem themselves. To implement this ruling, Fasciana shall submit a good faith estimate of expenses incurred to date to address the precise allegations that trigger Fasciana's advancement right. In other words, Fasciana should identify those costs that relate directly to the allegations that he made, or helped others from EDS make, misrepresentations to GECC and Kidder.

I understand and expect EDS to understand that some level of imprecision will be involved in the retrospective accomplishment of this task. But, in order to ensure the integrity of this process, Fasciana's attorneys shall provide a sworn affidavit certifying their good faith, informed belief that the identified litigation expenses relate solely to defense activity to address those allegations for which Fasciana is owed advancement. On a going-forward basis, Fasciana's advancement requests shall all be submitted in this format.

With this procedure in place, EDS should have adequate protection so that it can reserve any ultimate fight about the precise amounts until a later indemnification proceeding. Although I obviously cannot and will not prejudge any application by EDS in this action to challenge particular designations, the function of a § 145(k) advancement case is not to inject this court as a monthly monitor of the precision and integrity of advancement requests. Unless some gross problem arises, a balance of fairness and efficiency concerns would seem to counsel deferring fights about details until a final indemnification proceeding, by which time the details may not even matter as Fasciana may (depending on the outcome of the Criminal and Civil Actions) be obligated to repay all of the funds.[57]

## VII.

For the foregoing reasons, EDS's motion for partial summary judgment is granted in part and denied in part. Fasciana's motion for summary judgment is granted in part and denied in part. The parties shall present a conforming order within fourteen days.

---

57. In its answering brief, stated that "Fasciana's insurance company reimbursed at least $2,354.81 to Fasciana in connection with his defense of the EDS action." EDS's Answering Br. at 35 (Fasciana also discusses a claim he made to the Chicago Insurance Company, *see* Fasciana Aff. ¶ 4.) And, EDS argued "the amount requested must be reduced by that amount and any subsequent payments by the insurer." EDS's Answering Br. at 35. The parties have not, however, explained the nature of the relevant insurance policy and any payments made (or to be made) pursuant thereto. In order that I may properly decide the relevance of insurance payments with respect to Fasciana's advancement claim, the parties should submit letter briefs of not more than two pages in length. These letter briefs shall discuss in detail all of the facts relevant to any insurance policies related to the resolution of this case. And, these letter briefs shall discuss any legal authority pertaining to this issue. If, however, EDS cannot in good faith claim that this modest payment plus the advancements authorized by this opinion cover all of Fasciana's expenses, it should consider dropping this objection or explain why it has not in light of this reality. The parties may append exhibits as necessary. These letter briefs shall be submitted by no later than March 10, 2003.