# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FRED L. PASTERNACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12082-VCMR |
| | ) | |
| NORTHEASTERN AVIATION | ) | |
| CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 17, 2018
Date Decided: November 9, 2018

Paul D. Brown, Joseph B. Cicero, and Stephanie H. Dallaire, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Cynthia S. Arato and Daniel J. O'Neill, SHAPIRO ARATO LLP, New York, New York; *Attorneys for Plaintiff*.

Francis G.X. Pileggi and Alexandra D. Rogin, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; Edward J. Longosz, II, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Washington, D.C.; *Attorneys for Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor.**

In this case, Plaintiff, a pilot, seeks indemnification from Defendant, the aircraft charter and management company for which he flew planes. The underlying dispute for which Plaintiff seeks indemnification of legal fees and expenses arose in connection with the pilot's participation in random drug testing. The regulations governing the operations of the company require that the company submit a random selection of its pilots for drug testing. The company informed the pilot that he had been randomly selected. The pilot reported, as instructed, to the testing site and provided a sample, but the volume was insufficient to complete testing. Rather than waiting at the testing site until he could provide an adequate sample for testing, the pilot informed the drug test collector that he needed to attend an appointment but would return to complete the testing. The pilot left, and he returned a few hours later to complete the test. With the permission of the aircraft company, the collector resumed the test. The pilot's test results were negative for drugs, but the medical review officer determined that the pilot refused to take the test by leaving before the test was complete, resulting in an automatic failure of the drug test. As a result, the Federal Aviation Administration issued an emergency order and revoked the pilot's certificate to fly. The pilot challenged this finding through two levels of appeal. In the final resolution of the case, the Court of Appeals for the D.C. Circuit held that there was insufficient evidence to determine whether the collector gave the pilot

permission to leave and reversed the revocation. Thus, the pilot prevailed in his challenge.

Thereafter, the pilot sought indemnification for the legal expenses associated with those proceedings under the company's bylaws. The bylaws provide for mandatory indemnification for directors, officers, employees, and agents to the extent permitted by the Delaware General Corporation Law. Plaintiff argues that he is entitled to indemnification because he is an employee or agent of the company; his status as an employee or agent stems from his actions on behalf of the company and the company's control of those actions; he took the drug test by reason of his role as a pilot at the company; and he acted at all times in the best interest of or not opposed to the interests of the company. The aircraft company responds that it need not provide indemnification because Plaintiff (1) was neither an employee nor an agent because he was not acting in his pilot role during the drug test, (2) was not subjected to the drug test by reason of his affiliation with the company, and (3) did not act in good faith or in the best interests of the company when he prematurely left the drug test. Additionally, the company argues that the doctrine of laches bars Plaintiff's claims.

In this opinion, I hold that Plaintiff is an agent of the company, that he took the drug test by reason of his affiliation with the company, and that he acted in good faith and in a manner, at the very least, not opposed to the best interests of the

3

company.  Thus, the company must indemnify the pilot and pay fees-on-fees, and laches does not bar Plaintiff's claims.

## I. BACKGROUND

The facts in this opinion reflect my findings based on admitted allegations in the pleadings, stipulated facts, trial testimony of five witnesses, and thirty-nine documentary exhibits.[1]

### A. The History of Northeastern and Its Evolution

Michael J. Russo and two other individuals started Northeastern Aviation Corp. ("Northeastern" or the "Company") in December 1978.[2]  Northeastern operated as a Delaware corporation with its principal place of business at Republic Airport in Farmingdale, New York.[3]  Initially, the Company leased aircraft to a single small commuter airline.[4]  Northeastern employed no pilots at that time.[5]  Fred

---

[1]     Citations to the trial transcript are in the form "Tr. # (X)" with "X" representing the surname of the speaker.  Joint Trial Exhibits are cited as "JX #." Facts drawn from the Joint Pretrial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.  After initially identifying individuals, I reference surnames without honorifics or regard to formal titles such as "Doctor."  I intend no disrespect.

[2]     JX 1; PTO ¶¶ II.4-.5; *see* JX 30, at NEA00035, -37, -39.

[3]     PTO ¶ II.3.

[4]     Tr. 11:22-12:2 (Pasternack).

[5]     Tr. 12:23-13:7 (Pasternack).

L. Pasternack joined Northeastern in November 1980.[6] He became a stockholder, a director, and an officer of Northeastern, but Pasternack worked primarily as a medical doctor.[7]

In 1983, Northeastern's single customer went bankrupt; in response, Northeastern changed its business model and started operating as an aircraft charter and management company.[8] As a charter flight operator, Northeastern was and is regulated under Part 135 of the Federal Aviation Administration ("FAA") regulations ("Part 135").[9]

Russo and Pasternack initially served as Northeastern's only pilots.[10] But Northeastern grew during the 1980s, hired more pilots, and established a hierarchy for its staff.[11] In 1984, Pasternack became Northeastern's Chief Pilot, a position required by FAA regulations.[12] The Chief Pilot oversees the conduct of other pilots

---

[6]     JX 30, at NEA00044.

[7]     *Id.* at NEA00044, -94, -95; PTO ¶ II.1.

[8]     Tr. 12:3-16 (Pasternack).

[9]     14 C.F.R. Pt. 135 (entitled "Operating Requirements: Commuter and On Demand Operations and Rules Governing Persons on Board Such Aircraft"); Tr. 12:14-22 (Pasternack).

[10]    Tr. 15:20-16:1 (Pasternack).

[11]    Tr. 13:7-9, 16:2-7 (Pasternack).

[12]    JX 32, at FLP001463; Tr. 85:8-12 (Jordan); Tr. 150:18-22 (Montemurro); Tr. 227:1-6 (Russo).

within the company.[13]  The Chief Pilot reports directly to Russo, the Director of Operations, investigates any accident or incident, and acts as a liaison for Northeastern to the FAA.[14]  Pasternack remained the Chief Pilot until approximately 1987.[15]  After 1987, he continued to pilot flights for Northeastern, but not in the supervisory role of Chief Pilot.[16]  Despite Pasternack's recent service to Northeastern as a pilot and previously as Chief Pilot, no written employment agreement or agency agreement exists between him and Northeastern.[17]

Russo has been the President and Director of Operations of Northeastern since 1978.[18]  Although Russo no longer pilots flights for Northeastern,[19] he actively

---

[13]    Tr. 21:19-20 (Pasternack).

[14]    JX 16, at NA000560; Tr. 84:17-85:1 (Jordan). *See generally* JX 16, at NA000560.

[15]    Tr. 14:1-3 (Pasternack).

[16]    Tr. 15:2-9 (Pasternack).

[17]    Tr. 61:13-23 (Pasternack); Tr. 183:9-20, 184:14-18 (Montemurro); *see also* Tr. 187:16-188:3 (Montemurro) (testifying that he was unaware of any agreement disclaiming Pasternack's employee or agency status).  Similarly, in 2007, Russo did not have an employment agreement with Northeastern, despite his service to Northeastern as a pilot and as Director of Operations.  Tr. 188:18-23 (Montemurro).  Today, the Chief Pilot must be an employee of the company.  JX 16, at NA000711 ("Tier I personnel are direct employees" of Northeastern.); Tr. 227:15-16 (Russo).  The record does not show whether that was true in 1984, but because the Chief Pilot has responsibility for the conduct of other employed pilots, it seems likely that the Chief Pilot would be an employee.

[18]    JX 16, at NA000707; JX 30, at NEA00095.

[19]    Tr. 228:16-19 (Russo).

manages the Company, making a majority of the business decisions for the Company.[20]

## B. Northeastern Now

Since 1986, the ownership of Northeastern and its Board of Directors have remained unchanged.[21] Four stockholders, including Russo and Pasternack, each own twenty-five percent of Northeastern.[22] Both Russo and Pasternack serve on the Board of Directors; Russo serves as President, and Pasternack serves as a Vice President.[23]

Northeastern provides two types of pilots for its charter flights.[24] Its pilots are either full-time pilots or "on-demand" pilots.[25] Northeastern assigns full-time pilots a tour of duty, which means that for a specified time (for example, twenty days[26])

---

[20]     Tr. 233:6-9 (Russo); *see, e.g.*, Tr. 245:24-246:14 (Russo).

[21]     PTO ¶ II.7.

[22]     *Id.*

[23]     *Id.* ¶ II.6.

[24]     Tr. 80:17-81:2 (Jordan); *see* Tr. 85:19-86:3 (Jordan) (testifying that part of the Chief Pilot's role is to "provid[e] a set of qualified pilots to management or charter sales in order to staff aircraft").

[25]     Tr. 80:17-81:2 (Jordan).

[26]     Tr. 153:10-14 (Montemurro).

7

the pilot must remain fit to pilot a flight.[27] During that time, Northeastern requires that the full-time pilot be available for any flight Northeastern assigns to him or her.[28] Pilots may not drink alcoholic beverages during a tour of duty.[29] If a pilot becomes ill during the tour of duty, the pilot must inform Northeastern that he or she is not medically fit to fly.[30] Northeastern classifies its full-time pilots as employees and issues them W-2 forms.[31] Full-time pilots receive a salary, are not paid per flight, and are not paid beyond their usual salary for compliance activities like training and drug testing.[32] Northeastern provides full-time pilots benefits such as health insurance, life insurance, vacation and sick time, and paid personal days.[33]

---

[27] Tr. 89:16-24 (Jordan).

[28] Tr. 160:24-161:6 (Montemurro). Pilot qualifications are for specific types of aircraft, and a pilot must be qualified to fly the specific aircraft used for a flight. *See* Tr. 52:22-53:3, 55:12-20, 57:8-16 (Pasternack); Tr. 234:4-8, 262:4-5 (Russo).

[29] JX 16, at NA000569 ("The use of intoxicants, including beer and wine, by . . . flight crewmembers, while scheduled as available for duty, is prohibited."); *see* 14 C.F.R. § 91.17 (prohibiting pilots from consuming any alcoholic beverage within eight hours of flying).

[30] JX 16, at NA000568 ("Crewmembers have an individual responsibility for personal disqualification from flight status under conditions of medical deficiency . . . . All pilots are required to notify the Director of Operations of any change in their flying status.").

[31] Tr. 84:11-13 (Jordan).

[32] Tr. 113:19-22 (Jordan); Tr. 179:2-9 (Montemurro).

[33] Tr. 94:1-15 (Jordan).

8

Northeastern utilizes its on-demand pilots differently. Northeastern contacts one of its on-demand pilots if it is unable to staff a flight with full-time pilots.[34] The on-demand pilot then may, at his or her discretion and without justification, accept or decline the assignment.[35] To accept the assignment, the pilot must be fit to pilot the flight.[36] After accepting the assignment, the on-demand pilot, just like a full-time pilot, must "comply with the regulatory requirements for that [flight]" and with Northeastern's applicable policies.[37] In other words, after an on-demand pilot accepts the assignment, there is no functional difference between the full-time pilot and the on-demand pilot.[38] There remain, however, administrative differences; Northeastern issues each on-demand pilot an IRS Form 1099, and the pilots do not receive any employment benefits.[39] Northeastern pays its on-demand pilots per flight,[40] but like full-time pilots, Northeastern does not pay its on-demand pilots for

---

[34]     Tr. 96:22-97:3 (Jordan).

[35]     Tr. 97:4-6, 98:6-9 (Jordan).

[36]     Tr. 98:13-16 (Jordan).

[37]     Tr. 98:13-23 (Jordan); Tr. 163:7-11 (Montemurro).

[38]     Tr. 99:19-100:1 (Jordan); Tr. 163:7-11, 182:20-24 (Montemurro).

[39]     *See* PTO ¶¶ II.28-.37; Tr. 162:9-122 (Montemurro).

[40]     Tr. 154:1-8 (Montemurro).

9

compliance activities like training or drug testing.[41] Northeastern classifies these on-demand pilots as independent contractors.[42]

All pilots, whether full-time or on demand, must comply with applicable regulations to maintain their status as Part 135 pilots for Northeastern.[43] This compliance includes completion of regular training and an evaluation of flying skills.[44] It also includes compliance with Northeastern's drug testing program.[45] If pilots fail to comply with any applicable FAA or DOT regulations, they may not pilot any Northeastern flights.[46] In addition to these regulations, certain Northeastern policies apply to both full-time and on-demand pilots.[47] For example, all pilots must complete Northeastern's flight and ground training program annually; if a pilot fails to complete this training, he or she may not pilot any flights for Northeastern.[48] Additionally, all pilots must wear Northeastern uniforms during

---

[41]    *See* Tr. 156:16-22 (Montemurro).

[42]    Tr. 153:17-20 (Montemurro).

[43]    Tr. 94:16-22, 95:8-10 (Jordan).

[44]    Tr. 94:23-95:7 (Jordan).

[45]    Tr. 182:12-15, 218:11-20 (Montemurro).

[46]    *See, e.g.*, Tr. 218:11-20 (Montemurro).

[47]    Tr. 201:3-15 (Montemurro).

[48]    JX 16, at NA000580; Tr. 157:9-18 (Montemurro).

flights, and it therefore is not apparent to passengers whether an individual pilot is full-time or on demand.[49]

Pasternack flew for Northeastern as an on-demand pilot. He did not receive the benefits enjoyed by full-time pilots, such as vacation or sick benefits, paid personal days, paid holidays, health insurance benefits, life insurance benefits, workers' compensation benefits, unemployment compensation benefits, or participation in any type of retirement plan through Northeastern.[50] He received an IRS Form 1099, not a W-2.[51]

### C.    Northeastern's Regulatory Environment

"In 1983, Northeastern began operating its own charter flight service . . . under Part 135 . . . ."[52] This operation falls under Department of Transportation ("DOT") and FAA regulations.[53] Part 135 regulates charter flight service operators like Northeastern.[54]

---

[49]    JX 16, at NA000567; Tr. 22:10-11 (Pasternack); Tr. 183:1-8 (Montemurro).

[50]    PTO ¶¶ II.28-.35; Tr. 162:9-22 (Montemurro).

[51]    PTO ¶¶ II.36-.37.

[52]    *Id.*¶ II.9.

[53]    *Id.* ¶¶ II.9, II.14.

[54]    14 C.F.R. Pt. 135.

Under Part 135, Northeastern must assume responsibility for operational control over the flights it conducts.[55] "Operational control" means exercising "authority over initiating, conducting or terminating a flight."[56]

Under DOT regulations, to maintain its Part 135 certificate, Northeastern must conduct random alcohol and drug testing of its pilots.[57] DOT regulations—specifically, 49 C.F.R. Pt. 40 ("Part 40")—prescribe the procedures that Northeastern must follow in administering drug and alcohol testing.[58] Part 40 allows Part 135 operators to use "service agents" for drug and alcohol testing.[59] A "service agent," in this context, provides services to the operator (Northeastern) and its pilots in connection with DOT drug and alcohol testing requirements.[60]

---

[55] "Each certificate holder is responsible for operational control and shall list, in the manual required by § 135.21, the name and title of each person authorized by it to exercise operational control." 14 C.F.R. § 135.77.

[56] 14 C.F.R. § 1.1.

[57] *See* 14 C.F.R. § 135.251 (2009) (recodified at 14 C.F.R. § 120.35). Part 135 requires random drug testing of all individuals who perform safety-sensitive functions for the charter flight operator (in this case, Northeastern). 49 C.F.R. § 40.3. Under the statutory framework, both pilots and maintenance workers perform safety-sensitive functions, and therefore, Northeastern includes both in its pool for random drug testing. Tr. 129:3-10 (Schmitt); Tr. 163:2-6 (Montemurro). Because Pasternack's only safety-sensitive role was as a pilot, I focus solely on pilots.

[58] *See* 14 C.F.R. § 120.103; 49 C.F.R. Pt. 40.

[59] *See* 49 C.F.R. § 40.3.

[60] *Id.*

Service agents include, among other things, laboratories and medical review officers.[61] LabCorp, the laboratory where Pasternack reported for his drug and alcohol test, was a service agent of Northeastern.[62] ChoicePoint was another service agent and provided services to Northeastern as a medical review officer.[63]

Part 40 also limits what service agents may do.[64] Barring specific exceptions,[65] none of which apply here, service agents may "not make a determination that [a pilot] has refused a drug or alcohol test. This is a non-delegable duty" of Northeastern.[66]

---

[61]   *Id.*

[62]   PTO ¶ II.18.

[63]   *Id.* ¶ II.27; Tr. 35:1-9 (Pasternack); Tr. 179:17-180:13 (Montemurro). A medical review officer acts as "an independent and impartial 'gatekeeper'" in the drug-testing process, provides feedback to the flight operators, and confirms the laboratory's drug test results. 49 C.F.R. § 40.123(a), (b) (entitled "What are the MRO's responsibilities in the DOT drug testing program?").

[64]   49 C.F.R. § 40.355; PTO ¶ II.19.

[65]   49 C.F.R. § 40.355(j) ("As an exception to paragraph (i) of this section, [a service agent] may make a determination that [the pilot] has refused a drug or alcohol test, if: (1) [The service agent] schedule[d] a required test for an owner-operator or other self-employed individual, and the individual fails to appear for the test without a legitimate reason; or (2) [An MRO service agent] determine[d] that an individual has refused to test on the basis of *adulteration or substitution*." (emphasis added)).

[66]   49 C.F.R. § 40.355(i).

**D.     Pasternack's Drug Test**

In June 2007, Northeastern had a random drug testing program in place as required by the applicable FAA and DOT regulations.[67]  Northeastern submitted a list of its pilots, including Pasternack,[68] to Choice Point, and Choice Point used that list to randomly select individuals for drug testing.[69]  Choice Point contacted Donna Schmitt, Northeastern's Flight Department Administrator and Designated Employer Representative, and informed her that Pasternack had been selected for random drug testing.[70]

On June 1, 2007, Schmitt instructed Pasternack to report to LabCorp for his drug test (the "Drug Test").[71]  Pasternack realized that he did not have a custody and control form ("CCF Form") embossed with Northeastern's information.[72]  LabCorp requires the CCF Form to complete the Drug Test.[73]  Pasternack informed Schmitt, and Schmitt mailed a new CCF Form to him and instructed him to report for the

---

[67]     PTO ¶ II.26.

[68]     *Id.* ¶ II.27; Tr. 164:1-3 (Montemurro).

[69]     PTO ¶ II.27.

[70]     Tr. 127:17-19, 128:15-129:10, 134:20-135:1 (Schmitt).

[71]     PTO ¶ II.38.

[72]     Tr. 27:12-24 (Pasternack).

[73]     *See id.*

Drug Test after he received the CCF Form.[74] Pasternack received the CCF Form, and on June 5, 2007, shortly after 1:00 p.m., Pasternack reported to LabCorp to provide a urine sample for the Drug Test.[75]

At LabCorp, Pasternack followed the instructions of the LabCorp collector, Theresa Montalvo.[76] After Pasternack provided a sample, Montalvo informed him that the amount of urine he had provided was insufficient.[77] She instructed him to wait at the LabCorp facility until he was able to produce another sample.[78] Pasternack waited for approximately ten or fifteen minutes and then recalled that he had a 2:00 or 2:30 p.m. appointment with one of his medical patients.[79] He informed Montalvo that he needed to leave but that he would return the next day to complete the Drug Test.[80] Montalvo explained that she would need to call Northeastern, but

---

[74]  Tr. 27:24-28:3 (Pasternack); Tr. 145:17-20 (Schmitt).

[75]  PTO ¶ II.39.

[76]  *Id.* ¶ II.41.

[77]  *Id.* ¶ II.42; Tr. 30:12-15 (Pasternack).

[78]  PTO ¶ II.42.

[79]  *Id.* ¶ II.43; Tr. 30:19-31:2 (Pasternack).

[80]  PTO ¶ II.43.

she did not explain that Pasternack's departure would result in his Drug Test being deemed a "refusal to test."[81]

Pasternack's appointment was approximately eight blocks away.[82] After the appointment, he decided to return to LabCorp to complete the Drug Test that same afternoon.[83] LabCorp required that Northeastern first give its authorization to resume the Drug Test.[84] Although Schmitt, Northeastern's Designated Employer Representative, would have been the appropriate Northeastern representative to contact, Schmitt was not at work that day,[85] and Montalvo spoke with Peter Montemurro, Northeastern's General Manager.[86] She asked Montemurro to give permission, on behalf of Northeastern, to resume Pasternack's Drug Test after he returned.[87] Unfamiliar with drug testing requirements, Montemurro instructed

---

81    *See* Tr. 31:13-14 (Pasternack).

82    Tr. 32:1-2 (Pasternack).

83    Tr. 31:22-32:3 (Pasternack).

84    Tr. 32:9-12 (Pasternack).

85    Tr. 146:3-9 (Schmitt).

86    JX 16, at NA000707; Tr. 165:15-20 (Montemurro).

87    Tr. 165:21-166:2 (Montemurro).

16

Montalvo to "do whatever [she] think[s] is appropriate."[88] Montalvo continued the

Drug Test, and Pasternack provided a sufficient sample at that time.[89]

A few days later, ChoicePoint, in its role as medical review officer, deemed

Pasternack's Drug Test a "refusal to test" because Pasternack left LabCorp before

he completed the Drug Test.[90] On June 10, 2007, Schmitt informed Pasternack of

this result.[91] ChoicePoint determined that Pasternack failed the Drug Test solely due

to the refusal to test;[92] Pasternack's sample tested negative for drugs.[93]

After the Drug Test, Pasternack did not pilot any flights for Northeastern.[94]

### E.     The Underlying FAA Proceeding

On November 20, 2007, the FAA revoked Pasternack's pilot's certificates on

the ground that he refused to test.[95] Pasternack retained counsel to represent him in

---

[88]     Tr. 166:6-11 (Montemurro).

[89]     PTO ¶ II.45.

[90]     *Id.* ¶ II.46; *see* Tr. 35:1-9 (Pasternack).

[91]     Tr. 33:19-34:1 (Pasternack).

[92]     Tr. 35:10-13 (Pasternack); Tr. 181:24-182:6 (Montemurro).

[93]     Tr. 181:17-23 (Montemurro).

[94]     Tr. 169:5-8 (Montemurro); *see also* Tr. 213:4-23 (Montemurro).

[95]     Compl. ¶ 13.

the administrative proceeding and to challenge the FAA revocation.[96]  During the administrative proceedings, the FAA called ten witnesses, including employees of Northeastern.[97]  Administrative Law Judge Fowler affirmed the FAA's revocation.[98] Pasternack appealed the decision, initially to the National Transportation Safety Board ("NTSB") and then to the United States Court of Appeals for the D.C. Circuit.[99]  The D.C. Circuit remanded to the NTSB, which in turn remanded the matter to Judge Fowler for credibility determinations.[100]

After Judge Fowler upheld and the NTSB affirmed Judge Fowler's original decision, Pasternack filed a second appeal with the D.C. Circuit.[101]  The D.C. Circuit held that because there was insufficient evidence to show whether the collector (Montalvo at LabCorp) impliedly gave Pasternack permission to leave, Pasternack's departure was not a "refusal to test" and the NTSB's decision was arbitrary and

---

[96]     PTO ¶ II.47.

[97]     *Id.* ¶ II.48; Tr. 91:10-19 (Jordan); Tr. 164:9-18 (Montemurro).

[98]     PTO ¶ II.48.

[99]     Tr. 38:21-39:5 (Pasternack).

[100]    Tr. 39:5-13 (Pasternack).

[101]    Tr. 39:15-16; 39:22-40:2 (Pasternack).

18

capricious.[102]  On March 22, 2013, the D.C. Circuit reversed the decision of the NTSB, also reversing the revocation of Pasternack's pilot's certificates.[103]

### F.    Pasternack's Demand for Indemnification and This Litigation

At no point during the underlying FAA proceedings did Pasternack make any demands for indemnification from Northeastern for attorneys' fees.[104]  Over two years after the conclusion of the FAA proceeding, on October 20, 2015, Pasternack sent a letter to Northeastern requesting indemnification for approximately $140,000 in legal fees and expenses he incurred in defending himself during the FAA proceedings.[105]  His letter requests indemnification under Northeastern's bylaws, which, according to Pasternack's letter, "provide that employees shall be indemnified to the full extent allowed under Delaware law."[106]

Northeastern's corporate governance documents, including its bylaws (the "Bylaws"), have been in effect since 1980 or earlier[107] and remain unchanged since

---

[102]    *Pasternack v. Huerta*, 513 F. App'x 1 (D.C. Cir. 2013); Tr. 40:10-14 (Pasternack).

[103]    *Pasternack*, 513 F. App'x 1; Tr. 40:3-7 (Pasternack).

[104]    PTO ¶ II.50; Tr. 48:18-23, 65:10-16 (Pasternack); Tr. 168:7-18 (Montemurro); Tr. 245:13-17 (Russo); *see* Tr. 44:7-14 (Pasternack); Tr. 244:2-21, 288:17-289:10 (Russo).

[105]    JX 21, at NEA00135.

[106]    *Id.*

[107]    PTO ¶ II.8.

19

incorporation.[108]   The Bylaws contain an indemnification provision:   "The corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware."[109]

Northeastern responded to Pasternack's request via letter on November 3, 2015.[110]   In that letter, Northeastern stated that it will "check[] into this matter and . . . get back to [Pasternack] in the near future."[111]   Northeastern never substantively responded to Pasternack's letter.[112]

On March 7, 2016, Pasternack filed his Verified Complaint for Indemnification against Northeastern.[113]   This Court held a two-day trial in this matter on March 15 and 16, 2018.

## II.   ANALYSIS

"To succeed at trial, 'Plaintiff[] . . . ha[s] the burden of proving each element . . . of each of his causes of action against [the] Defendant . . . by a

---

[108]   *Id.*; *see* Tr. 11:7-15 (Pasternack).

[109]   JX 29, at NEA00030.

[110]   JX 21; PTO ¶ II.52.

[111]   JX 21.

[112]   PTO ¶ II.53; Tr. 45:1-5 (Pasternack); Tr. 288:1-6 (Russo).

[113]   JX 22.

preponderance of the evidence.'"[114]  "Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[115]

## A. Northeastern Aviation Must Indemnify Pasternack Under Its Mandatory Indemnification Bylaw

Pasternack seeks indemnification under Northeastern's Bylaws for legal fees and expenses he incurred in defending himself in the underlying FAA proceedings.[116]  The Bylaws' indemnification provision states, "The corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware."[117]  Section 145(a) of the Delaware General Corporation Law sets out the relevant requirements for indemnification by a corporation:

> A corporation shall have power to indemnify any person
> who was or is a party . . . to any threatened, pending or

---

[114] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) (quoting *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016)), *aff'd*, 177 A.3d 610 (Del. 2017).

[115] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[116] Compl. ¶¶ 27-33.

[117] JX 29, at NEA00030.

completed action, suit or proceeding, whether civil, criminal, administrative or investigative . . . by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, . . . against expenses (including attorneys' fees) . . . actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation . . . .[118]

Thus, the evidence must show that (1) Pasternack was a party to a threatened, pending, or completed action, suit, or proceeding by reason of the fact that he was a director, officer, employee, or agent of Northeastern; (2) the action, suit, or proceeding was brought neither by nor in the right of the corporation; (3) he actually and reasonably incurred legal expenses in connection with the action, suit, or proceeding; and (4) he "acted in good faith and in a manner [he] reasonably believed to be in or not opposed to the best interests of the corporation."[119]

The parties dispute (1) whether Pasternack was an agent or employee of Northeastern,[120] (2) whether Pasternack's participation in the underlying FAA proceedings was "by reason of the fact" of his affiliation with Northeastern, and

---

[118]    8 *Del. C.* § 145(a).

[119]    *Id.*

[120]    Pasternack does not argue that he was acting as an officer or director at the time of the Drug Test. *See generally* Pl.'s Opening Br. 30-43 (arguing only that Pasternack was an employee or an agent–independent contractor).

(3) whether Pasternack acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation.[121]

### 1. Pasternack was an agent of Northeastern

The party seeking indemnification under Section 145(a) must be a director, officer, employee, or agent. Pasternack asserts that he is an employee or agent.[122] "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."[123] "It is well settled that questions of agency are not subject to absolute rules but, rather, turn on the facts of the individual case."[124]

Then-Vice Chancellor, now-Chief Justice, Strine discussed agency as it relates to Section 145 in *Fasciana v. Electronic Data Systems Corp.*[125] As he explained, to serve the policy rationale of Section 145, this Court limits agency in

---

[121] Def.'s Answering Br. 9. Defendant also argues that Pasternack failed to mitigate his legal expenses. *Id.* The parties stipulated that the reasonableness of Pasternack's legal expenses will be addressed, if necessary, separately from the determination of indemnification. PTO 18 n.3; Post-Trial Hr'g Tr. 32:20-22. Any dispute regarding mitigation of legal expenses will be addressed in that process.

[122] Pl.'s Opening Br. 30-43.

[123] *Cochran v. Stifel Fin. Corp.*, 2000 WL 286722, at *17 (Del. Ch. Mar. 8, 2000) (quoting *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57 (Del. 1997)), *aff'd in pertinent part*, 809 A.2d 555 (Del. 2002).

[124] *Fisher*, 695 A.2d at 61 (quoting *Sussex Cty. v. Morris*, 610 A.2d 1354, 1360 (Del. 1992)).

[125] 829 A.2d 160, 163 (Del. Ch. 2003).

the indemnification context to "only those situations when an outside contractor . . . can be said to be acting as an arm of the corporation vis-à-vis the outside world."[126] Further, the underlying proceeding must result from the purported agent's "conduct on behalf of the corporation."[127]

When applying this definition of agency in the context of a Part 135 charter flight operator, all pilots, whether full-time or on demand, are agents for the operator when piloting a flight. Northeastern, as the Part 135 carrier, "authorizes" the pilot to "exercise operational control" of a flight.[128] The pilot is "acting as an arm of the corporation vis-à-vis" Northeastern's passengers, air traffic controllers, and ground crew.

Northeastern's General Operations Manual (the "Manual") supports this conclusion. It states explicitly that "[Northeastern] retains responsibility for the operational control of aircraft operations, and thus the safety of each flight conducted under its Certificate and Operations Specifications, including the actions of all direct employees and agents."[129] "All flight crewmembers will be either a Direct

---

[126]   *Id.*

[127]   *Id.*

[128]   14 C.F.R. § 135.77.

[129]   JX 16, at NA000708.

Employee or an Agent for [Northeastern]."[130]   The Manual repeats this explicit

statement: "[All crewmembers] are either employees or agents of [Northeastern]."[131]

Defendant concedes this point but tries to distinguish the conduct of a pilot

during a flight from the conduct of a pilot during a drug test.  Defendant argues that

Pasternack acted as an agent only when he was piloting a flight and not during other

tasks such as taking the Drug Test.  Defendant posits that Pasternack was not acting

on behalf of Northeastern when Pasternack appeared for the Drug Test.[132]

The record shows otherwise.  Northeastern provided the names of all its pilots

to its service agent ChoicePoint.[133]  Northeastern designated Pasternack as one of its

pilots.[134]  ChoicePoint randomly selected, from all of Northeastern's pilots, which

pilots must be tested to satisfy Northeastern's regulatory obligations for the calendar

quarter.[135]  In June 2007, ChoicePoint informed Northeastern that Pasternack had

---

[130]    *Id.*

[131]    *Id.* at NA000712.

[132]    Def.'s Answering Br. 24.

[133]    Tr. 132:7-133:12 (Schmitt).

[134]    Tr. 87:22-88:5 (Jordan); Tr. 164:1-3 (Montemurro).  Defendant argues that Pasternack was not subject to random drug testing because he was not current with regard to training requirements.  This argument does not explain why Northeastern kept Pasternack in the pool of pilots, thus making him subject to random drug testing.  *See* Tr. 86:4-17 (Jordan) (testifying that Northeastern uses its list of pilots as a compliance tracking tool).

[135]    Tr. 133:6-15 (Schmitt).

been randomly selected.[136] Schmitt, Northeastern's Designated Employer Representative, instructed Pasternack to report for the drug test at LabCorp.[137] When Pasternack informed Schmitt that he did not have the requisite CCF Form, Schmitt sent him a new form and instructed him to report to LabCorp as soon as he received it.[138] Northeastern and ChoicePoint took these actions to ensure Northeastern's compliance with FAA and DOT regulations.[139]

Pasternack complied with the instructions he received from Northeastern and ChoicePoint. When Pasternack left the facility, he believed he did so with the implied permission of the collector at the facility, Theresa Montalvo.[140] Montalvo then contacted Northeastern.[141] When Pasternack returned to resume the drug test, Montalvo refused to resume testing until she received authorization from Northeastern to do so[142] because it was Northeastern's nondelegable duty to

---

[136]     Tr. 134:20-135:1 (Schmitt).

[137]     Tr. 145:14-16 (Schmitt).

[138]     Tr. 145:17-146:2 (Schmitt).

[139]     *See* 14 C.F.R. § 135.251 (2009) (recodified at 14 C.F.R. § 120.35).

[140]     *See* PTO ¶¶ II.43-.44.

[141]     Tr. 165:15-19 (Montemurro).

[142]     Tr. 32:9-12 (Pasternack).

determine whether Pasternack could continue the Drug Test.[143]  By reporting for the Drug Test and by complying with Northeastern and ChoicePoint's instructions, Pasternack acted on behalf of Northeastern to ensure Northeastern's compliance with the FAA and DOT regulations.  Pasternack acted as an arm of Northeastern vis-à-vis the FAA and the DOT.  Thus, Pasternack acted as Northeastern's agent during the Drug Test.

Because I conclude that Pasternack acted as Northeastern's agent at the time of Drug Test, I need not address whether Pasternack was an employee of Northeastern at that time.

### 2. Pasternack appeared for the Drug Test by reason of the fact of his agency status with Northeastern

The party seeking indemnification must be a party to a proceeding by reason of the fact of his corporate function.[144]  There must be a "causal connection or nexus between [the underlying proceeding] and [Pasternack's] corporate function or 'official [corporate] capacity.'"[145]  "The phrase 'by reason of' can be equated to 'by virtue of,' 'by force of,' or 'by the authority of.'"[146]

---

[143]    49 C.F.R. § 40.355(i).

[144]    *Perconti v. Thornton Oil Corp.*, 2002 WL 982419, at *4 (Del. Ch. May 3, 2002).

[145]    *Id.* (third alteration in original) (quoting *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *6 (Del. Ch. Mar. 8, 2000)).

[146]    *Id.*

Northeastern determined, in compliance with FAA and DOT regulations, who was in the pool of pilots subject to random drug testing.[147] Schmitt informed Pasternack that he was selected to submit to a random drug test and instructed him to report for the Drug Test.[148] Pasternack reported to the Drug Test by reason of the instructions he received from Schmitt. Although Pasternack, as an on-demand pilot, could refuse a flight assignment, he could not refuse to take the Drug Test. The consequence of such a refusal would be that Pasternack could no longer pilot flights for Northeastern.[149]

Additionally, Pasternack had no independent individual requirement to complete the Drug Test. His sole reason for attending the Drug Test was his affiliation with Northeastern, a Part 135 charter flight operator.[150] But for Pasternack's affiliation with Northeastern, there would have been no reason for him to initiate the Drug Test. In short, Northeastern instructed Pasternack to report for the random drug test, and Pasternack did so by reason of that instruction.

---

[147]     Tr. 180:18-20 (Montemurro).

[148]     PTO ¶ II.38.

[149]     Tr. 217:6-11 (Montemurro).

[150]     Tr. 143:17-20 (Schmitt).

Defendant argues that Pasternack prematurely left the testing facility for his own reasons, not on behalf of Northeastern.[151] Pasternack left the LabCorp facility because he had an appointment in connection with his work as a medical doctor.[152] This argument, however, ignores Pasternack's reason for appearing for the Drug Test, which is solely attributable to his affiliation with Northeastern. But for that relationship, the "refusal to test" and underlying FAA proceeding would not have occurred. Pasternack appeared for the Drug Test by reason of the fact of his agency relationship with Northeastern.

### 3. Pasternack acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of Northeastern

Section 145(a) requires that the party seeking indemnification "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."[153] Northeastern argues that Pasternack acted in a

---

[151] Def.'s Answering Br. 24-25.

[152] PTO ¶ II.43; Tr. 30:19-31:2 (Pasternack).

[153] 8 *Del. C.* § 145(a). Although Section 145(c) mandates indemnification when the party seeking indemnification was "successful on the merits or otherwise in defense of any action, suit, or proceeding," this mandate applies only to directors and officers. *See Cochran*, 2000 WL 1847676, at *2 n.6 (noting the amendment of Section 145(c) in 1994 to remove mandatory indemnification of agents). The parties agree that Pasternack was not acting in his role as director or officer in connection with the Drug Test or the subsequent proceedings. Def.'s Answering Br. 1-2; *see generally* Pl.'s Opening Br. 3-14.

manner opposed to the best interests of Northeastern when he prematurely left the Drug Test to attend an appointment related to his work as a medical doctor and completely unrelated to his affiliation with Northeastern and also when he pursued extensive administrative and legal proceedings to challenge the FAA's revocation.[154]

According to Northeastern, Pasternack, as a medical doctor and as a former medical review officer, should have known the consequences of his actions—namely, that the Drug Test would be deemed a "refusal to test."[155] The D.C. Circuit, however, held that there was insufficient evidence to show that Pasternack left the Drug Test without the implied permission of the LabCorp collector.[156] Further, Pasternack credibly testified that he was unaware that ChoicePoint would deem his departure a refusal to test.[157] Northeastern points to no credible evidence to the contrary. Pasternack, therefore, did not act in a manner opposed to Northeastern's best interests when he left the Drug Test.

Additionally, at trial, Russo testified that a pilot's failed drug test negatively impacts the carrier's reputation.[158] Pasternack's challenge to the FAA's revocation

---

[154]    Def.'s Answering Br. 35-38.

[155]    *Id.* at 37.

[156]    *Pasternack v. Huerta*, 513 F. App'x 1 (D.C. Cir. 2013).

[157]    Tr. 34:6-13 (Pasternack).

[158]    Tr. 274:21-275:3 (Russo).

and his ultimate exoneration served to protect Northeastern's reputation. Further, if Pasternack had not challenged the revocation, he would not be allowed to serve Northeastern as a pilot. His protection of Northeastern's reputation and his service to Northeastern were in the best interests, or at a minimum, not opposed to the best interests, of Northeastern.

Because Pasternack has shown that he acted as an agent of Northeastern when appearing for the Drug Test, that he appeared for the Drug Test by reason of the fact of his agency status, and that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of Northeastern, he is entitled to mandatory indemnification as provided by Northeastern's Bylaws.[159]

## B. Pasternack Timely Requested Indemnification

Defendant argues that despite Pasternack's commencement of this indemnification action within the analogous three-year statute of limitations, Pasternack's claim must be denied on the basis of laches.

"[L]aches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and

---

[159] The parties have stipulated that the reasonableness of Pasternack's legal expenses will be addressed, if necessary, separately from the determination of indemnification. PTO 18 n.3; Post-Trial Hr'g Tr. 32:20-22.

third, resulting prejudice to the defendant."[160] A plaintiff's "action will be barred by laches only if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of his claim within the time allowed by law."[161]

Defendant argues that Plaintiff's unreasonable delay in filing this action unfairly prejudiced the Company.[162] "[U]nreasonable delay involves consideration of whether the plaintiff acted with the degree of diligence that fairness and justice require."[163] Northeastern claims that had Pasternack requested indemnification before the conclusion of the underlying proceeding, Northeastern would have participated in the proceeding to Pasternack's benefit.[164]

First, Plaintiff's indemnification claim was not ripe until the conclusion of the underlying FAA proceeding in March 2013.[165] Second, Northeastern cites no authority supporting its purported right to participate in the underlying

---

[160] *Reid v. Spazio*, 970 A.2d 176, 182-83 (Del. 2009) (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005)).

[161] *Id.* at 183.

[162] Def.'s Answering Br. 46.

[163] *Houseman v. Sagerman*, 2015 WL 7307323, at *8 (Del. Ch. Nov. 19, 2015).

[164] Def.'s Answering Br. 46.

[165] *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 509 (Del. 2005) ("Whether a corporate officer has a right to indemnification is a decision that must necessarily await the outcome of the investigation or litigation.").

proceedings.[166]  I am aware of no such authority in Delaware, and Northeastern's Bylaws do not establish this right.  Third, despite its claim that it was unable to participate in the underlying FAA proceeding, Northeastern did, in fact, participate in the underlying FAA proceeding.  Northeastern representatives testified in the underlying FAA proceeding.[167]

In support of its argument, Northeastern discusses *Houseman v. Sagerman*.[168] In *Houseman*, this Court focused on prejudice suffered by the defendants in determining that the plaintiffs' delay was unreasonable.  Mrs. Houseman's justifications for the delay in filing her claim (that she could not accurately calculate the monetary amount at issue, that she wanted to avoid the expense of a second litigation, and that this Court would likely stay the action pending resolution of a related action in another jurisdiction) "ignore the concern that the Defendants may suffer prejudice by the Plaintiffs' delay."[169]  In this action, Defendant fails to show that Pasternack's delay in filing his claim offends fairness and justice or prejudices Northeastern.  Northeastern merely conjectures that Pasternack's delay is attributable to the integrity of his claim.  Northeastern fails to point to any prejudice

---

[166]    *See* Def.'s Answering Br. 46.

[167]    Tr. 91:10-19 (Jordan); Tr. 164:9-18 (Montemurro).

[168]    2015 WL 7307323 (Del. Ch. Nov. 19, 2015).

[169]    *Id.* at *9.

it suffered after March 2013, when Pasternack's indemnification claim became ripe.[170]

I do not find that "unusual conditions or extraordinary circumstances" are present that "make it inequitable to allow the prosecution of [Pasternack's] claim within the time allowed by [the analogous statute of limitations]."[171] I therefore hold that Pasternack filed this action within a reasonable time after the underlying proceeding concluded and that laches is inapplicable here.

## C. Pasternack Is Entitled to Fees-on-fees

It is well settled in Delaware law that when a claimant prevails on an indemnification claim, an award of fees-on-fees is permissible.[172] Northeastern provides indemnification "to the extent permitted by the General Corporation Law of Delaware."[173] To give full effect to Section 145, an award of fees-on-fees is not only permissible, but appropriate in light of the language of Northeastern's indemnification provision and the policy of Section 145. This policy "eschew[s a] narrow construction of the statute," and "without an award of attorneys' fees for the

---

[170]     *See* Def.'s Answering Br. 46-47.

[171]     *Reid*, 970 A.2d at 183.

[172]     *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561-62 (Del. 2002); *Levy v. HLI Operating Co.*, 924 A.2d 210, 225 (Del. Ch. 2007).

[173]     JX 29, at NEA00030.

indemnification suit itself, indemnification [is] incomplete."[174]  Had Northeastern desired to avoid payment of fees-on-fees, it could have tailored its indemnification provision to exclude such payments.[175]  It did not.  Thus, Pasternack's request for an award of fees-on-fees is granted.

## III.   CONCLUSION

For the foregoing reasons, I conclude that Pasternack has shown that he is entitled to (1) indemnification under Northeastern's bylaws and (2) fees-on-fees under Delaware law.  Additionally, Defendant has not shown that the doctrine of laches applies.

The parties shall confer and advise the Court within thirty days of this opinion whether any outstanding matters remain that require the Court's attention.  If not, this opinion will serve as the final order of the Court.

**IT IS SO ORDERED**.

---

[174]    *Stifel Fin. Corp.*, 809 A.2d at 561.

[175]    *See id.* at 561-62.