# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ESTATE OF MARTHA BAROTZ, by
its Executor, Peter Barotz,

    Plaintiff/Counterclaim-Defendant,

v.

VIDA LONGEVITY FUND, L.P.,

    Defendant/Counterclaim-Plaintiff.

)
)
)
)
)
) C.A. No. N20C-05-144 EMD CCLD
)
)
)
)

Submitted: October 17, 2022[1]
Decided: November 9, 2022

*Upon Plaintiff Estate of Martha Barotz' Motion for Summary Judgment,*
**GRANTED**

*Upon Defendant Vida Longevity Fund, L.P.'s Motion for Summary Judgment,*
**DENIED**

Donald L. Gouge, Jr., Esq., Donald L. Gouge, Jr., LLC, Wilmington, Delaware, Joseph M. Kelleher, Esq., Cozen O'Connor, Philadelphia, Pennsylvania, *Counsel for Plaintiff Estate of Martha Barotz*

David P. Primack, Esq., McElroy, Deutsch, Mulvaney & Carpenter, LLP, Wilmington, Delaware, Eric A. Biderman, Esq., James M. Westerlind, Esq., Julius A. Rousseau, Esq., Arent Fox LLP, New York, New York, *Counsel for Defendant Vida Longevity Fund, L.P.*

**Davis, J.**

## I.      INTRODUCTION

This civil action is assigned to the Complex Commercial Litigation Division of this Court. The action concerns an $8 million life insurance policy (the "Policy") issued by Pacific Life Insurance Company insuring the life of Martha Barotz. When Martha Barotz passed away in 2018, Defendant Vida Longevity Fund, L.P. ("VLF") received the Policy's death benefit. The

---

[1] D.I. No. 214.

Estate of Martha Barotz (the "Estate") claims it is entitled to recover the death benefit from VLF under 18 *Del. C.* § 2704 ("Section 2704") because the Policy is void for lack of insurable interest. VLF claims the Policy is supported by a valid insurable interest and, alternatively, that VLF is entitled to the payout based on various defenses and counterclaims.

Both parties moved for summary judgment on December 24, 2021. For the reasons explained below, the Court **GRANTS** the Estate's motion and **DENIES** VLF's motion.

## II. BACKGROUND

### A. PARTIES

The Estate was established in New York after the death of Martha Barotz, a resident of New York.[2] The Executor of the Estate is Mrs. Barotz's husband, Peter Barotz.[3] Both the Estate and Mr. Barotz are New York citizens.[4] VLF is a Delaware limited partnership with its principal place of business in Austin, Texas.[5]

### B. THE POLICY

In 2006, the Barotz family became clients of Spalding Financial Group ("SFG") through Craig Stack, one of its insurance agents.[6] The Court notes that the record contains no evidence as to any discussions that may have occurred among the Barotz family and Mr. Stack regarding the family's insurance needs.

Lindsay Spalding—another insurance agent at SFG—offered testimony concerning the business practices that SFG employed at the time. Although Ms. Spalding never met any member of the Barotz family,[7] she eventually signed the application for the Policy as the

---

[2] Second Am. Compl. ("SAC") ¶ 1 (D.I. 71).
[3] *Id.*
[4] *Id.*
[5] *Id.* ¶ 2.
[6] Estate's Mot. for S.J., Ex. 10 at 13:22–14:17, 19:5–19:8.
[7] *Id.*, Ex. 10 at 11:2–11:13.

"Soliciting Agent."[8]  Ms. Spalding also testified as a witness in *Sun Life Assurance Co. Canada v. U.S. Bank National Association* ("*Sol*"), which concerned a life insurance policy that Ms. Spalding brokered while working for SFG in late 2005.[9]  The policy in *Sol* was financed through nonrecourse premium financing issued under Coventry Capital's premium finance program (the "PFP Program").[10]

In the current case, Ms. Spalding testified that SFG maintained a "streamlined" process under which SFG would contact various groups to secure financing for their clients' insurance needs.[11]  One such group was Coventry Capital.[12]  Although the record is silent as to any discussions SFG may have had with the Barotz family, Ms. Spalding confirmed that SFG's internal records show that Coventry Capital provided financing for Mrs. Barotz's Policy through its PFP Program.[13]

The record indicates that, in March 2006, Coventry Capital provided Mrs. Barotz with a "Loan Proposal" containing the "indicative terms and conditions upon which we may be able to arrange [nonrecourse] financing" for her Policy.[14]  Mrs. Barotz was 71 year old at the time.[15]  According to Coventry Capital's summary, Pacific Life Insurance Company would issue a life insurance policy for Mrs. Barotz with a premium of $257,678 and a death benefit of $8 million.[16]  LaSalle Bank N.A. ("LaSalle") would then issue a nonrecourse loan of $257,678 to pay the premium.[17]  The loan's term was to be 26 months with an annual interest of 9.50%.[18]  The

---

[8] *Id.*, Ex. 11 at 9.
[9] 369 F. Supp. 3d 601, 604–605 (D. Del. 2019).
[10] *Id.* at 605.
[11] *Id.*, Ex. 10 at 25:22–26:23.
[12] *Id.*, Ex. 10 at 25:6–26:23.
[13] *Id.*, Ex. 10 at 25:6–25:21.
[14] Estate's Mot. for S.J., Ex. 14 at 1.
[15] Id., Ex. 14 at 2.
[16] *Id.*, Ex. 14 at 3.
[17] *Id.*, Ex. 14 at 4.
[18] *Id.*, Ex. 14 at 4.

collateral for the loan would be a security interest in "(i) each of the Policies or in the beneficial interest of a statutory trust holding the Policies and (ii) insurance coverage maintained by the Lender."[19] The "Borrower" was not Mrs. Barotz herself, but rather the "Martha Barotz 2006 Family Trust, Premium Finance Sub-Trust."[20]

Coventry Capital instructed Mrs. Barotz to sign and submit several "Trust Agreements" to effectuate the transaction.[21] One Trust Agreement directed the creation of the "Martha Barotz 2006 Family Trust" (the "Trust"), a Delaware statutory trust, so that the Trust could apply for and own the Policy.[22] The Trust Agreement selected Wilmington Trust Company as trustee, and designated that (i) Delaware law would govern the Trust and (ii) Delaware would act as the Trust's situs.[23] Furthermore, the Trust Agreement provided that the Trust would be nominally funded with "the sum of $1."[24] Ms. Spalding testified that Coventry Capital was the party that would draft such Trust Agreements and their terms.[25]

Additionally, Coventry Capital provided a "Supplement to Trust Agreement" directing the creation of the Martha Barotz 2006 Family Trust, Premium Finance Sub-Trust (the "Sub-Trust").[26] The Supplement said that the Policy would pass directly to the Sub-Trust, which would take out a loan to pay the premiums and pledge the "Policy, and all proceeds thereof" as the sole collateral for the nonrecourse loan.[27] Wilmington Trust Company, as trustee, took all direction from Coventry Capital/LaSalle.[28] In addition, Wilmington Trust Company held the

---

[19] *Id.*, Ex. 14 at 4.
[20] *Id.*, Ex. 14 at 2.
[21] *See id.*, Ex. 14 at 2, 6.
[22] *Id.*, Ex. 15 ¶ 3.
[23] *Id.*, Ex. 15 ¶¶ 10, 15
[24] *Id.*, Ex. 15 ¶ 2.
[25] *See id.*, Ex. 10 at 119:24–121:18.
[26] *Id.*, Ex. 15 at 8–18.
[27] *Id.*, Ex. 15 at 8.
[28] *Id.*, Ex. 15 at Art. II, § 3; *id.*, Ex. 15 at Art. III, § 2.

4

Policy solely for the benefit of Coventry/LaSalle.[29] During the term of the Loan, the Trust was prohibited from holding any property other than the "Initial Trust Estate" of $1, the Sub-Trust was prohibited from holding any property other than the "Sub-Trust Estate" (*i.e.*, the Policy), and Mrs. Barotz was prohibited from indicating to anyone that the Policy was her own asset or attempting to instruct Pacific Life Insurance Company to change the owner or beneficiary of the Trust.[30]

Coventry Capital also utilized a "Note and Security Agreement" between the Sub-Trust and LaSalle. The Note established a nonrecourse loan for 26 months to finance the premiums with total payments amounting to $327,557.31.[31]

Coventry Capital required the execution of two power of attorney forms. The power of attorney appointed Coventry Capital as Mrs. Barotz's attorney-in-fact "with full powers of substitution to act in [her] name," for purposes including "originating and/or servicing any life insurance policies insuring [her] life" with the "power to complete and execute any applications or other documents in connection with the maintenance, or liquidation of the Policies."[32] The second power of attorney appointed Coventry Capital as attorney-in-fact for Mrs. Barotz's husband in his capacity as the named co-trustee of the Trust and Sub-Trust respectively, with "full powers of substitution to act in [his] name, place and stead for the purpose of it originating, maintaining, servicing, and/or liquidating . . . any life insurance policies . . . which are owned by the Trust."[33]

---

[29] *Id.*
[30] *Id.*, Ex. 15 at Art. II, §§ 6, 7(b).
[31] *Id.*, Ex. 16 at 2, 3, 9.
[32] *Id.*, Ex. 17 at 1.
[33] *Id.*, Ex. 18 at 1.

5

Finally, Coventry Capital provided a Disclosure stating, in relevant part, that the Trust Agreement creating the Trust (and the Supplement creating the Sub-Trust)

> are not intended to satisfy Settlor [Mrs. Barotz's] estate planning needs and have not been designed as an estate planning tool. Settlor hereby confirms that the Program Administrator has recommended to Settlor that Settlor consult with Settlor's own legal, tax, accounting and financial advisors regarding individual estate planning needs.[34]

On March 30, 2006, Wilmington Trust Company applied for the Policy as proposed owner and beneficiary in its capacity as trustee of the Trust.[35] As noted previously, Ms. Spalding signed the application as the Soliciting Producer.[36] The Policy was issued on April 20, 2006[37] and delivered to Wilmington Trust Company as owner in Delaware.[38] On April 26, 2006, Coventry Capital paid the premium of $257,678 to put the Policy into effect.[39]

The material facts relating to Mrs. Barotz's Policy are substantially identical to the policy at issue in *Sun Life Assurance Company Canada v. U.S. Bank National Association ("Sol")*. In *Sol*, Coventry Capital provided the insured, Harriet Sol, with the same set of documents as Coventry Capital provided to Mrs. Barotz.[40] By agreeing with Coventry Capital's proposals, the insured in *Sol* created a series of trusts that would obtain a life insurance policy through a nonrecourse premium loan from LaSalle.[41] The policy purchased by the loan served as the sole collateral, capping the maximum amount of the borrower's loss at the value of the policy.[42] If the sub-trust failed to pay back or refinance the loan in 26 months, the policy would be seized by

---

[34] *Id.*, Ex. 19 at 1–2 (emphasis added).
[35] *Id.*, Ex. 11 at 1, 6, 9.
[36] *Id.*, Ex. 11 at 9.
[37] *Id.*, Ex. 20.
[38] *Id.*, Ex. 21.
[39] *Id.*, Ex. 22.
[40] *See Sun Life Assurance Co. Canada v. U.S. Bank Nat. Assn., Sol*, 369 F. Supp. 3d 601, 605–606 (D. Del. 2019).
[41] *Id.*
[42] *Id.*

LaSalle and/or Coventry Capital.[43] And once the financing was secured, an SFG employee submitted a formal application to Sun Life for the policy.[44] In short, Mrs. Barotz's Policy was the product of the same premium financing program involving the same entities as the policy in *Sol*.

## C. THE POLICY CHANGES HANDS AND MRS. BAROTZ PASSES AWAY

Coventry Capital ordered a life expectancy report for Mrs. Barotz in April 2008.[45] In July 2018, the Trust was sold to "2008 Barotz Insurance Trust" in July 2008,[46] the registered holder of which was Midas Life Settlements LLC ("Midas").[47] Midas paid $390,400 for the Policy, which was $62,842.69 greater than the loan balance.[48] Midas paid off the Coventry Capital loan and remitted the excess $62,842.69 to Mrs. Barotz.[49]

In its opening brief, the Estate claims the Policy was then sold to Financial Credit Investment II Limited ("FCI"), an Apollo entity.[50] Although the record contains no documents showing a transaction between Midas and FCI, FCI subsequently sold a portfolio containing the Policy to VLF in December 2018.[51] VLF paid a total of $155,714,020.81 for the portfolio that contained the Policy.

Mrs. Barotz passed away less than a month after VLF obtained the Policy.[52] VLF received the Policy's death benefit of $8,005,698.63.[53]

## D. LITIGATION

---

[43] *Id.*
[44] *Id.*
[45] Estate's Mot. for S.J., Ex. 23.
[46] *Id.*, Ex. 24 at 1.
[47] *Id.*, Ex. 25 at B-1.
[48] *Id.*, Ex. 24 at 1
[49] *Id.*, Ex. 24 at 17–20.
[50] *Id.* at 10–11.
[51] *Id.*, Ex. 26.
[52] *Id.*, Ex. 29.
[53] *Id.*, Ex. 30 at 2.

The Estate commenced this action in May 2020. The Estate's Second Amended Complaint brings two claims against VLF: (1) a claim for "Recovery of Insurance Proceeds Due to Lack of Insurable Interest," brought under Section 2704, and (2) a claim in the alternative for unjust enrichment.[54] VLF's answer asserted fourteen affirmative defenses and four counterclaims: (1) declaratory judgment, (2) breach of contract, (3) promissory estoppel, and (4) indemnification/specific performance.[55]

Both parties filed motions for summary judgment on December 24, 2021.[56] The Court heard argument on April 8, 2022.[57] The Supreme Court of Delaware issued a decision in the case of *Wells Fargo Bank, N.A. v. Estate of Phyllis M. Malkin* on May 26, 2022.[58] This Court permitted the parties to file supplemental briefing addressing the effect of the *Malkin* decision on the cross-motions.[59] The parties filed their supplemental briefs on July 11, 2022.[60] Subsequently, without prompting from the Court, the parties have submitted notices of supplemental authorities and how these authorities might impact the decision in this case.[61] The last filing was submitted on October 17, 2022.[62]

### III. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to

---

[54] SAC ¶¶ 35–46.
[55] Answer to SAC at 11–20, 35–41 (D.I. 73).
[56] VLF's Mot. for S.J. (D.I. 124); Estate's Mot. for S.J. (D.I. 138).
[57] D.I. No. 204.
[58] *Wells Fargo Bank, N.A. v. Est. of Malkin*, 2022 WL 1671966 (Del. May 26, 2022).
[59] *See* Estate's Supp. Br. (D.I. 209); VLF's Supp. Br. (D.I. 210).
[60] D.I. Nos. 209 and 210.
[61] D.I. Nos. 213 and 214. The new authority is *Estate of Beverly M. Berland v. Lavastone Capital LLC*, 2022 WL 15023450 (D. Del. Sept. 28, 2022).
[62] D.I. No. 214.

8

determine whether genuine issues of material fact exist, "but not to decide such issues."[63]

Summary judgment will be granted if, after viewing the record in a light most favorable to a

nonmoving party, no genuine issues of material fact exist and the moving party is entitled to

judgment as a matter of law.[64] If, however, the record reveals that material facts are in dispute,

or if the factual record has not been developed thoroughly enough to allow the Court to apply the

law to the factual record, then summary judgment will not be granted.[65] The moving party bears

the initial burden of demonstrating that the undisputed facts support his claims or defenses.[66] If

the motion is properly supported, then the burden shifts to the non-moving party to demonstrate

that there are material issues of fact for the resolution by the ultimate fact-finder.[67]

"These well-established standards and rules equally apply [to the extent] the parties have

filed cross-motions for summary judgment."[68] Where cross-motions for summary judgment are

filed and neither party argues the existence of a genuine issue of material fact, "the Court shall

deem the motions to be the equivalent of a stipulation for decision on the merits based on the

record submitted with the motions."[69] But where cross-motions for summary judgment are filed

and an issue of material fact exists, summary judgment is not appropriate.[70] To determine

---

[63] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

[64] *Id.*

[65] *See Ebersole v. Lownegrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[66] *See Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing Ebersole, 180 A.2d at 470).

[67] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[68] *IDT Corp.*, 2019 WL 413692, at *5 (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001)).

[69] Del. Super. Civ. R. 56(h).

[70] *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. June 19, 2017), *aff'd sub nom., Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008); *see also Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 738 (Del. Ch. 2001) ("[T]he presence of cross-motions 'does not act per se as a concession that there is an absence of factual issues.'") (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)).

whether there is a genuine issue of material fact, the Court evaluates each motion independently.[71]  The Court will deny summary judgment if the Court determines that it is prudent to make a more thorough inquiry into the facts.[72]

---

[71] *Motors Liquidation*, 2017 WL 2495417, at *5; *see Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del. Ch. 2003).

[72] *Ebersole*, 180 A.2d at 470–72.

# IV. PARTIES' CONTENTIONS

## A. THE ESTATE

The Estate contends the Policy is void under Section 2704 for two reasons: (1) the Policy lacked insurable interest because Mrs. Barotz did not actually pay its premiums and (2) even if Mrs. Barotz could be deemed to have paid the premiums, the Policy was not taken out in good faith for a lawful insurance purpose but rather as a cover for a wager. The Estate also argues that VLF's affirmative defenses and counterclaims fail as a matter of law because they are inconsistent with Delaware's strong public policy against STOLIs and the statutory language of Section 2704. Throughout its opening brief, the Estate claims this case is functionally identical to other cases in which life insurance policies were held void for lack of insurable interest.

## B. VLF

VLF's counterarguments to the Estate's motion double as affirmative arguments for its own motion. VLF's arguments fall into two general categories. First, VLF contends the Policy was supported by valid insurable interest because the nonrecourse funding satisfied the conditions described in *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*[73] and *Lavastone Cap. LLC v. Est. of Berland*.[74] Second (and alternatively), VLF claims that Mrs. Barotz or her Estate have waived, released, or otherwise forfeited any claims against VLF.

## C. SUPPLEMENTAL CONTENTIONS

Through supplemental briefing, the Estate argues that *Malkin* simply confirms that VLF's counterclaims and affirmative defenses fail as a matter of law. Conversely, VLF claims that *Malkin* permits a downstream purchaser like VLF to assert common-law defenses and

---

[73] 28 A.3d 1059 (Del. 2011).
[74] 266 A.3d 964 (Del. 2021).

11

counterclaims in actions brought under Section §2704(b), and that its defenses and counterclaims prevail under the facts of this dispute.

## V. DISCUSSION

The Court holds that: (1) the Policy lacks an insurable interest and thus is void under Section 2704; (2) VLF's affirmative defenses and counterclaims fail as a matter of law; and (3) the Estate is entitled to the proceeds of the Policy under Section 2704(b). Thus, the Estate's motion is **GRANTED** and VLF's motion is **DENIED**.

### A. APPLICABLE LAW

"For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk."[75] Delaware codified the requirement that a person procuring a life insurance policy must have an "insurable interest" in the life of the insured in Section 2704. Section 2704(a) provides:

> Any individual of competent legal capacity may procure or effect an insurance contract upon his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

The categories of persons that have an insurable interest in an individual's life include the individual insured and others, such as close family members or business associates and the "trustee of a trust created and initially funded by" the insured.[76]

In *Price Dawe*, the Supreme Court answered three certified questions regarding the application of Section 2704 to STOLI schemes.[77] First, the Supreme Court held that "a life

---

[75] *Berland*, 266 A.3d at 967–68.
[76] *Id.* at 968 (citing 18 *Del. C.* § 2704(c)).
[77] *Price Dawe*, 28 A.3d at 1065-76.

insurance policy lacking an insurable interest is void as against public policy and thus never comes into force."[78] Therefore, an insurer could challenge the validity of a life insurance policy based on a lack of insurable interest after the expiration of the contractual two-year contestability period required by 18 *Del. C.* § 2908. Second, the Supreme Court held that Sections 2704(a) and (c)(5) do not prohibit an insured from procuring a policy on his or her own life and immediately transferring the policy, or a beneficial interest in a trust that owns and is the beneficiary of the policy, to a person without an insurable interest in the insured's life.[79] This can be done so long as (i) the insured procured or effected the policy and (ii) the transaction is not a mere cover for a wager.[80] Third, the Supreme Court held that a trust established by an individual insured has an insurable interest in the life of that insured when, at the time of the application for the life insurance, the individual intends that the beneficial interest in the trust would be transferred to a third-party investor with no insurable interest in the individual's life following the issuance of the policy, but only if the individual insured created and funded the trust.[81]

In 2021, the Supreme Court answered three more certified questions in its decision in *Berland*. Relevant here is the Supreme Court's analysis of the second question:

> Does 18 *Del. C.* § 2704(a) and (c)(5) forbid an insured or his or her trust to procure or effect a policy on his or her own life using a non-recourse loan and, after the contestability period has passed, transfer the policy, or a beneficial interest in a trust that owns the policy, to a person without an insurable interest in the insured's life, if the insured did not ever intend to provide insurance protection beyond the contestability period?[82]

The Supreme Court explained that the analysis in *Price Dawe* emphasizes two considerations when evaluating whether a policy lacks an insurable interest: (1) whether the insured or the

---

[78] *Id.* at 1065.
[79] *Id.* at 1068.
[80] *Id.*
[81] *Id.* at 1076.
[82] *Berland,* 266 A.3d at 971.

13

trustee of the insured's trust obtained the policy in good faith for a lawful insurance purpose, and not as a cover for a wagering contract; and (2) the source of the funding for the premiums.[83] The Supreme Court found that the certified question effectively asked how these considerations apply where (1) the source of the funding is a nonrecourse loan and not from any assets of the insured and (2) the insured's intent was to transfer ownership after the end of the contestability period, rather than "immediately" as in *Price Dawe*.[84] The Court explained that "*Price Dawe* directs courts to determine who procured a policy by examining 'who pays the premiums.'"[85]

Regarding the use of premium financing, the Supreme Court held:

> If used to facilitate procurement of a policy for a legitimate insurance purpose, such as estate planning, then premium financing is a recognized and permissible tool. But the use of such financing might also be evidence of an impermissible STOLI scheme, especially where the use of a nonrecourse loan means that a third party, and not the insured, bears the entire financial liability for obtaining the policy. The use of a nonrecourse loan to fund the premium therefore is not dispositive, but should be viewed in the context of the entire transaction and in conjunction with consideration of whether the insured intended, when obtaining the policy, "to purchase the policy for lawful insurance purposes, and not as a cover for a [wagering] contract." If the use of nonrecourse funding allows the insured— individually or as settlor or grantor of a trust—to obtain the policy "without actually paying the premiums," then the requirements of §§ 2704(a) and (c)(5) are not met.
>
> \*     \*     \*
>
> For these reasons, our answer to the second certified question is No, so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy "without actually paying the premiums" and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract.[86]

In 2022, the Supreme Court answered another set of certified questions through its *Malkin* decision. The first question was whether a third-party purchaser of an insurance contract that is void under Section 2704(a) and *Price Dawe* could assert either a bona fide purchaser

---

[83] *Id.*
[84] *Id.* at 971–72.
[85] *Id.*
[86] *Id.* at 972–73.

defense or a securities defense under the Delaware UCC.[87] The Supreme Court held that those defenses are not available because the defendant in action brought under Section 2704(b) do face an "adverse claim" as the Delaware UCC defines that term.[88] However, the Court explained that Section 2704(b) "is not inconsistent with all common-law defenses or counterclaims that a downstream purchaser of a policy might assert against an estate" and that courts must look to the "elements" of those defenses and counterclaims—"and, where appropriate, the public policy underlying the ban on human-life wagering"—to decide their viability in an action brought under Section 2704(b).[89] The second question in *Malkin* was whether a defendant in a Section 2704(b) action can recover any premiums it paid to maintain the policy. The Court held that such a defendant may recover the premiums it paid on the void contract if it can "establish the elements of a viable legal theory, such as unjust enrichment."[90]

## B. THE POLICY IS VOID FOR LACK OF INSURABLE INTEREST

### 1. Mrs. Barotz did not actually pay the Policy's premiums.

Under *Berland*, the Policy is void for lack of insurable interest if the use of nonrecourse funding allowed Mrs. Barotz to obtain the Policy without paying the premiums. The Court finds that there is no genuine factual dispute that Mrs. Barotz paid the premiums.

The insurance agent from SFG who signed the application for the Policy, Ms. Spalding, was asked at her deposition to explain the "big picture" of the financing provided under the Coventry PFP Program.[91] Ms. Spalding explained:

> **A**: Coventry would agree to finance the policy for, like in this case 26 months. So they would pay the premiums for two years and that would give the client insurance, basically free insurance for two years. And it is kind of like a free look for the two

---

[87] *Malkin*, 2022 WL 1671966, at *1.
[88] *Id.* at *10.
[89] *Id.* at *6.
[90] *Id.* at *14.
[91] Plaintiff's Mot. for S.J., Ex. 10 at 89:16–89:19.

years, and they have that time to determine if they wanted to keep it. God forbid if they had a health change they would keep it or if not, they would sell it in the life settlement market.

**Q**: <u>Did the insureds have any obligation to repay the loan</u>?

**A**: <u>No</u>.

**Q**: So what happened if they didn't repay the loan?

**A**: They, Coventry, would take the policy as the collateral and that was it.[92]

Ms. Spalding also testified that the arrangement allowed clients, like Mrs. Barotz, to obtain their policies "risk free."[93] The undisputed facts confirm Ms. Spalding's characterization of the Policy. The record demonstrates that Mrs. Barotz and her family were not parties to the nonrecourse loan. The record also shows that neither Mrs. Barotz nor her family members paid the premiums using their own funds. The most Mrs. Barotz ever stood to lose under the nonrecourse loan was the Policy itself, which would never have existed but for the loan that funded it. The Court finds that there is no factual dispute that Mrs. Barotz paid the premiums either individually or through a trust.

The Court finds additional support for this conclusion in the District of Delaware's *Sol* decision. As discussed above, the policy in *Sol* was the product of the same Coventry Capital PFP Program as Mrs. Barotz's Policy. On summary judgment, the *Sol* Court found that "a reasonable juror, taking the evidence in the light most favorable to [the defendant], could find only that Ms. Sol [the insured] did <u>not</u> procure the Policy" because "[Ms.] Sol did not pay the premiums herself, with funds she had prior to the series of transactions relating to issuance of the

---

[92] *See id.*, Ex. 10 at 89:20–90:11 (emphasis added).

[93] *See id.*, Ex. 10 at 128:9–129:6; *see also id.*, Ex. 10 at 25:17–25:21 ("Q: Do you recall that these premium finance programs . . . would be called nonrecourse and that the insured who borrowed the money would have no personal obligation to repay the loans? A: Yes."); *see id.*, Ex. 10 at 45:15–46:3 (re-iterating that the Policy was effectively a "two-year free look").

Policy."[94]  The *Sol* Court rejected the defendant's argument that Ms. Sol "procured the Policy by obtaining a loan from Coventry Capital/LaSalle that she had a contractual obligation to repay and which, ultimately, she did repay" because Ms. Sol did not have a "genuine obligation" to repay loan.[95]  One reason for this conclusion was that "it was not actually [Ms.] Sol, but instead the Sub-Trust, which was the borrower on the loan (as well as being the holder of the Policy)"— thus, the Sub-Trust owed the obligation to repay the loan, not Sol.[96]  Even if Ms. Sol was considered the borrower, "the non-recourse nature of the loan meant that neither she nor the Sub-Trust had an 'obligation to repay' sufficient to support a conclusion that [she] actually 'procured' the Policy."[97]  Accordingly, the *Sol* Court concluded that the Policy lacked an insurable interest at its inception, making it void *ab initio* under Delaware law.[98]  The same rationale and conclusion prevail in this litigation because Mrs. Barotz's Policy was the product of the same scheme as the policy in *Sol*.

During argument, VLF urged the Court to disregard *Sol* because it was decided before the Supreme Court issued its decision in *Berland* and *Berland* did not expressly endorse its reasoning.  This argument fails for at least two reasons.  First, *Berland* made clear that a life insurance policy lacks an insurable interest if the use of nonrecourse financing allows the insured to obtain the policy "without actually paying the premiums."[99]  Appropriately, *Sol* rested on the court's conclusion that the use of nonrecourse financing allowed the insured to obtain her policy without "pay[ing] the premiums herself."[100]  *Sol* is therefore entirely consistent with *Berland* despite pre-dating it.  Second, the Court would reach the same conclusion concerning Mrs.

---

[94] *Sol*, 369 F. Supp. 3d at 610 (emphasis in original).
[95] *Id.*
[96] *Id.*
[97] *Id.* at 611.
[98] *Id.* at 617.
[99] *Berland*, 266 A.3d at 973.
[100] *Sol*, 369 F. Supp. 3d at 610.

17

Barotz's Policy even if it were to disregard *Sol* as persuasive precedent. Again, Coventry Captial's PFP Program was designed to provide the insured "free insurance for two years" and imposed no "obligation [on the insured] to repay the loan."[101] Therefore, there is no genuine dispute that Mrs. Barotz did not pay the premiums.

### 2. VLF fails to raise a factual dispute precluding summary judgment for the Estate.

VLF argues that there are factual disputes concerning the Estate's claims that: (1) the loan was "part of a program by Coventry to manufacture policies" for the life settlement market; (2) Mrs. Barotz was "induced" to participate in the PFP Program; and (3) that Coventry Captial dictated every part of the transaction.[102] The Court finds that these purported factual disputes are irrelevant to the operative question of whether Mrs. Barotz actually paid the premiums under her Policy.

More pertinently, VLF attempts to raise a factual dispute by invoking the representations and warranties Mrs. Barotz made in connection with the sale of Policy.[103] Among other things, Mrs. Barotz warranted that she "had not engaged in any conduct that would preclude buyer's recovery of benefits under the Policy" and agreed to indemnify the buyer and its successors for "any lack by the Trust of an insurable interest in the life of the Insured at the time of the issuance of the Policy."[104] VLF contends it is entitled to summary judgment in its favor based on these representations and warranties or, "at the very least, they create an issue of fact with respect to the factual allegations that the Estate relies upon for its motion."[105] The Court disagrees and will

---

[101] Estate's Mot. for S.J., Ex. 10 at 89:20–90:11.
[102] *See* VLF's Answering Br. at 4–16.
[103] *See id.* at 15–16.
[104] *Id.* (citing VLF's Answering Br., Ex. 25 at §§ 1.10, 2.4).
[105] *Id.* at 16.

address VLF's argument in more detail below. Thus, there are no factual disputes precluding summary judgment in the Estate's favor.

### 3. VLF's arguments under *Berland* fail.

VLF argues that the Estate has failed to establish that the Policy is an illegal human life wager under Delaware law. In relevant part, VLF claims that Mrs. Barotz should be deemed to have paid the Policy's premiums because the Trust, "at [Mrs. Barotz's] direction, borrowed the money to pay premium on the Policy using a PFP Loan that [Mrs. Barotz] herself applied for. When that loan came due, [she] decided that she wanted to sell the Policy for money and directed her Trust to sell the Policy and repay the loan in full."[106] According to VLF, it is therefore "indisputable that the insured's trust actually paid the premiums as required under *Berland*, which recognizes that an insured may use a nonrecourse loan to pay policy premiums so long as the insured or trust actually pays the policy premiums."[107] VLF adds that "nonrecourse loans and obligations are both lawful and commonly used, and the fact that LaSalle had no recourse against [Mrs. Barotz] personally and was limited to recovering the Policy in the event of default does not negate the Trust's obligation to repay the loan."[108]

VLF is correct that "nonrecourse loans and obligations are both lawful and commonly used"—*Berland* acknowledged that. But *Berland* makes clear that the analysis does not end there:

> *Price Dawe* directs courts to determine who procured a policy by examining "who pays the premiums." The estate argues that the premium-financing structure here— through which the premium payments were funded by a nonrecourse loan to the subtrust, and Berland did not use any of her own assets—reflects that third parties procured the policy. Lavastone argues that Delaware law permits the use of premium financing to obtain a life-insurance policy, and that the "only relevant question, then, is whether the loan transaction constitutes an unlawful wager under

---

[106] VLF's Answering Br. at 18.
[107] *Id.* at 18–19
[108] *Id.* at 20.

the *Price Dawe* factors." *If used to facilitate procurement of a policy for a legitimate insurance purpose, such as estate planning, then premium financing is a recognized and permissible tool.* But the use of such financing might also be evidence of an impermissible STOLI scheme, especially where the use of a nonrecourse loan means that a third party, and not the insured, bears the entire financial liability for obtaining the policy.[109]

Thus, the Court does not agree that *Berland* categorically permits the use of nonrecourse loans. Moreover, VLF cannot reasonably argue that the nonrecourse loan here was "used to facilitate procurement of a policy for a legitimate insurance purpose, such as estate planning."[110] Mrs. Barotz was explicitly warned from the outset that "the Trust Agreement and the Supplement to Trust Agreement are not intended to satisfy [her] estate planning needs and have not been designed as an estate planning tool."[111]

Finally, it bears repeating that nonrecourse premium financing "might also be evidence of an impermissible STOLI scheme, especially where the use of a nonrecourse loans means that a third party, and not the insured, bears the entire financial liability for obtaining the policy."[112] The undisputed facts establish that was just the situation here. Mrs. Barotz never paid any premiums using her own funds, and the most she ever stood to lose was the Policy itself. Mrs. Barotz bore no financial liability whatsoever—like the insured in *Sol*, Mrs. Barotz "did not have a *genuine obligation* to repay the full amount of the Coventry/LaSalle loan."[113]

*Price Dawe* established that "an insured cannot 'procure or effect' a policy without actually paying the premiums."[114] There can be no genuine dispute that Mrs. Barotz did not actually pay the premiums under her Policy, which was designed and marketed to function as

---

[109] *Berland*, 266 A.3d at 972 (internal citations omitted) (emphasis added).
[110] *Id.*
[111] Plaintiff's Mot. for S.J., Ex. 19 at 1–2.
[112] *Berland*, 266 A.3d at 972.
[113] *Sol*, 269 F. Supp. at 610 (emphasis added).
[114] *Price Dawe*, 28 A.3d at 1076.

"free insurance for two years."[115]  The Policy therefore lacks an insurable interest as required under Section 2704, making it void *ab initio*.

### C. VLF'S AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW

VLF's answer raised fourteen affirmative defenses.[116]  In its opening brief, the Estate argues none of the defenses preclude summary judgment in the Estate's favor because none are viable under Delaware law.  Conversely, VLF contends it is entitled to summary judgment on its affirmative defenses asserting: (1) waiver; (2) release; and (3) that the Estate's claims are barred under the Delaware Uniform Commercial Code.  The Court agrees with the Estate and holds that VLF's affirmative defenses fail.

#### 1. Waiver and release

First, VLF's waiver defense asserts that the Estate "has no rights to the Policy under 18 *Del. C.* § 2704 because Martha Barotz, Nathan Barotz, Peter Barotz, and the Trust waived them in connection with the knowing and intentional relinquishment of the Policy."[117]  Separately, VLF asserts that the Estate's cause of action is "also barred under the doctrine of release."[118]  Both defenses rest on one paragraph from the Acknowledgement and Consent that Mrs. Barotz signed in connection with her sale of the Policy:

> The Insured, for itself and on behalf of its respective successors, assigns, hereby remises, releases and forever discharges each of the Buyer and its present and former officers, directors, stockholders, employees, agents, attorneys, successors, affiliates and assigns from any and all claims, rights, actions, causes of action, suits, liabilities, defenses, damages and costs that challenge or invalidate Buyer's right to, or the proceeds of the Policy, that may exist now or in the future, that relate to alleged wrongdoing of third parties, including those parties involved in the origination of the Policy or any financing to pay premiums thereon.[119]

---

[115] *See* Plaintiff's Mot. for S.J., Ex. 10 at 89:20–90:11.
[116] *See* Answer to SAC at 12–20.
[117] *Id.* at 13.
[118] *Id.* at 14.
[119] *See* Answer to SAC, Ex. A at 5.

21

VLF's reliance on the release form is misplaced. *Price Dawe* made clear that a life insurance policy lacking an insurable interest is void *ab initio* because it violates Delaware's "clear public policy against wagering."[120] Because the insurable interest requirement "serves the substantive goal of preventing speculation on human life," Section 2704(a) requires "more than just technical compliance at the time of issuance. Indeed, the STOLI schemes are created to feign technical compliance with insurable interest statutes."[121]

Similarly, *Berland* rejected arguments that the estate's claim was barred under the doctrines of *in pari delecto* and unclean hand because "the General Assembly has prescribed that the estate should receive the proceeds of the policy [created through a STOLI scheme] as a matter of public policy."[122] In light of *Price Dawe* and *Berland*, VLF should not be allowed to circumvent Delaware's strong public policy against STOLIs simply because Mrs. Barotz agreed to sign a boilerplate release form. To hold otherwise would legitimize the attempts of STOLI promoters to "feign technical compliance with insurable interest statutes."[123]

This conclusion is consistent with *Malkin*. In *Malkin*, the Supreme Court directed trial courts to assess the "elements of the common-law defenses . . . asserted—and, where appropriate, the public policy underlying the ban on human-life wagering—to decide the viability of such defenses . . . to an estate's action under Section 2704(b)."[124] Here, VLF's defenses of waiver and release stand in direct conflict with public policy. "Under Delaware common law, if a life insurance policy lacks an insurable interest at inception, it is void *ab initio*

---

[120] *Price Dawe*, 28 A.3d at 1067–68.
[121] *Id.* at 1074.
[122] *Berland*, 266 A.3d at 974.
[123] *Price Dawe*, 28 A.3d at 1074; *see also Est. of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263, 1276–77 (S.D. Fla. 2019), *aff'd sub nom. Est. of Malkin v. Wells Fargo Bank, N.A.*, 998 F.3d 1186 (11th Cir. 2021) (holding an insured did not relinquish her estate's right to recover a policy's death benefit under Section 2704 by signing a boilerplate release form).
[124] *Malkin*, 2022 WL 1671966, at *6.

because it violates Delaware's clear public policy against wagering."[125]  If VLF's defenses of waiver or release were accepted, they would allow a downstream purchaser to retain the death benefit paid under a void policy in clear contradiction to Delaware common law and Section 2704(a).  Accordingly, those defenses are not "viab[le]" in the STOLI context.[126]

### 2. UCC defenses

VLF argues the Estate's claims are barred under UCC Section 8-502.[127]  *Malkin* expressly held that a defendant in a Section 2704(b) action cannot assert a UCC Section 8-502 defense.[128]  Thus, this defense likewise fails as a matter of law.

Because the affirmative defenses for which VLF seeks summary judgment fail, they do not preclude summary judgment for the Estate.

### D. VLF'S COUNTERCLAIMS FAILS AS A MATTER OF LAW

The Estate moves for summary judgment on VLF's four counterclaims, whereas VLF moves for summary judgment on its counterclaims for breach of contract and indemnification/specific performance.  The Court holds that the Estate prevails on all four counterclaims as a matter of law.

First, the declaratory judgment counterclaim asks the Court to enter a judgment "declaring the rights, status and legal relations among [VLF] and the Estate with respect to the Policy's proceeds."[129]  The Court has done so by finding the Policy lacks an insurable interest under Section 2704, making the declaratory judgment counterclaim moot.

---

[125] *Price Dawe*, 28 A.3d at 1067–68.
[126] *See Malkin*, 2022 WL 1671966, at *6.
[127] VLF's Mot. for S.J. at 29–30.
[128] *Malkin*, 2022 WL 1671966, at *10.
[129] Answer to SAC at 35–36.

Second, the breach of contract claim alleges the Estate "materially breached the representations and warranties in the Acknowledgment and Consent signed by Martha Barotz."[130] This counterclaim is simply rehashes VLF's defenses of waiver and release, and fails for the same reasons.

Third, VLF's promissory estoppel claim is a repackaging of its breach of contract claim, again resting on the Acknowledgment and Consent.[131] Thus, this counterclaim fails as well.

The final counterclaim "seeks specific performance of the Estate's obligation to hold it harmless [from] any and all claims, losses, liabilities, costs and expenses, including without limitation reasonable attorneys' fees and disbursements, that it has incurred, and will in the future incur, with respect to this action."[132] This counterclaim asks the Court to give effect to the terms of the Acknowledgment and Consent. Again, the Court declines to do so. "At its core, *Price Dawe* reaffirmed the unsavory truth about STOLI policies: they are nothing more or less than a bet that a stranger will die. *Price Dawe* held that in Delaware, at least, such bets never pay off."[133] Thus, VLF's counterclaims uniformly fail as a matter of law.

### E. THE ESTATE IS ENTITLED TO THE POLICY'S PROCEEDS

Section 2704(b) provides that "[i]f the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death . . . of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them." Section 2704(b) "directs that if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the

---

[130] *Id.* at 36–37.
[131] *Id.* at 38–39.
[132] *Id.* at 40–41.
[133] *Estate of Malkin*, 379 F. Supp. 3d at 1279 (internal citations omitted).

death benefit from the recipient."[134] Because the Estate has succeeded in demonstrating that Mrs. Barotz's Policy lacked an insurable interest at inception as a matter of law, the Estate is entitled to the death benefit paid to VLF under the Policy.

Furthermore, because the Estate prevails on its Section 2704(b) claim, the Court does not need to consider the Estate's claim in the alternative for unjust enrichment.

## VI.    CONCLUSION

The Estate's motion for summary judgment is **GRANTED** and VLF's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**

November 9, 2022
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:    File&ServeXpress

---

[134] *Berland*, 266 A.3d at 969.